UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APPLE MORTGAGE CORP.,

          *Plaintiff,*

    v.

RICHARD BARENBLATT, KEITH FURER
DAVID BREITSTEIN and KEVIN UNGAR,

          *Defendants.*

Civil Action No. 13 CV 9233 (JGK)

**STATEMENT PURSUANT TO
LOCAL CIVIL RULE 56.1 IN
SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT DISMISSING
DEFENDANTS' COUNTERCLAIMS**

Pursuant to Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and in support of its motion for summary judgment dismissing all counterclaims asserted against it, plaintiff Apple Mortgage Corp. ("Apple") hereby submits that there is no genuine issue to be tried as to the following material facts:

1.      Defendant David Breitstein ("Breitstein") began working as a mortgage loan originator ("MLO") at Apple in November 2002. *See* Declaration of Jonathan Rogin dated June 19, 2015 ("Rogin Decl."), Ex. D [Breitstein Tr.] at 6-7.

2.      Defendant Keith Furer ("Furer") began working as an MLO at Apple in November 1998. *See* Rogin Decl., Ex. E [Furer Tr.] at 9.

3.      Defendant Richard Barenblatt ("Barenblatt") began working as an MLO at Apple in November 1998. *See* Rogin Decl., Ex. F [Barenblatt Tr.] at 6.

4.      Defendant Kevin Ungar ("Ungar") began working as an MLO at Apple in mid-2001. *See* Rogin Decl., Ex. G [Ungar Tr.] at 10-11.

5.      Breitstein acknowledged receipt of Apple's January 2003 Employee Handbook (the "Employee Handbook") on or about January 30, 2003.  *See* Employee Handbook (Rogin Decl., Ex. I); Breitstein Acknowledgment (Rogin Decl., Ex. J); Breitstein Tr. at 30-32.

6.      Furer acknowledged receipt of the Employee Handbook on or about February 20, 2004.  *See* Furer Acknowledgement (Rogin Decl., Ex. K); Furer Tr. at 29-30.

7.      Barenblatt acknowledged receipt of the Employee Handbook on or about January 30, 2003.  *See* Barenblatt Acknowledgment (Rogin Decl., Ex. L); Barenblatt Tr. at 48-49.

8.      Ungar acknowledged receipt of the Employee Handbook on or about February 20, 2004.  *See* Ungar Acknowledgment (Rogin Decl., Ex. M); Ungar Tr. at 25-26.

9.      Defendants agreed, as set forth in the Employee Handbook, "to follow all laws and regulations."  *See* Employee Handbook at § 104; Breitstein Tr. at 33; Furer Tr. at 30; Barenblatt Tr. at 45; Ungar Tr. at 27.

10.      Defendants agreed, as set forth in the Employee Handbook, that it was very important to Apple to "protect our confidential business information and trade secrets," and that Apple's confidential information included "customer lists," "financial information" and "marketing strategies," among other things.  *See* Employee Handbook at § 112; Breitstein Tr. at 33-34; Furer Tr. at 30-31; Barenblatt Tr. at 45; Ungar Tr. at 27-28.

11.      Defendants agreed, as set forth in the Employee Handbook, not to "send[] or post[] confidential materials . . . outside of the organization."  *See* Employee Handbook at § 517; Breitstein Tr. at 37-38; Furer Tr. at 32; Ungar Tr. at 29.

12.      Defendants agreed, as set forth in the Employee Handbook**,** that both "theft or inappropriate removal or possession of property" and "unauthorized disclosure of . . .

confidential information" comprised unacceptable conduct.  *See* Employee Handbook at § 701; Breitstein Tr. at 38; Furer Tr. at 33; Barenblatt Tr. at 47-48; Ungar Tr. at 29-30.

13.     Breitstein's compensation formula was set forth in a "Compensation Agreement" signed by him on or about July 2, 2012.  *See* Breitstein Compensation Agreement (Rogin Decl., Ex. N); Breitstein Tr. at 41.

14.     Furer's compensation formula was set forth in a "Compensation Agreement" signed by him on or about July 2, 2012.  *See* Furer Compensation Agreement (Rogin Decl., Ex. O); Furer Tr. at 34.

15.     Barenblatt's compensation formula was set forth in a "Compensation Agreement" signed by him on or about July 12, 2012.  *See* Barenblatt Compensation Agreement (Rogin Decl., Ex. P); Barenblatt Tr. at 49.

16.     Ungar's compensation formula was set forth in a "Compensation Agreement" signed by him on or about July 2, 2012.  *See* Ungar Compensation Agreement (Rogin Decl., Ex. Q); Ungar Tr. at 33-34.

17.     By signing their respective compensation agreements, Defendants agreed that they were required to "comply with all federal and state laws."  *See* Rogin Decl. Exs. N-Q, at Section 1.3.

18.     On August 19, 2013, all four defendants met together with Alan Rosenbaum, the president of GuardHill Financial Corporation ("GuardHill"), about the possibility of going to work as MLOs at that company.  *See* Breitstein Tr. at 55-56, 75; Furer Tr. at 37-38, 59; Barenblatt Tr. at 34-35, 51-52; Ungar Tr. at 44.

19.     On or about August 30, 2013, Breitstein signed an employment agreement with GuardHill.  *See* Breitstein/GuardHill Employment Agreement (Rogin Decl., Ex. R); Breitstein Tr. at 95.

20.     On or about August 31, 2013, Furer signed an employment agreement with GuardHill.  *See* Furer/GuardHill Employment Agreement (Rogin Decl., Ex. S); Furer Tr. at 62.

21.     On or about September 3, 2013, Barenblatt signed an employment agreement with GuardHill.  *See* Barenblatt/GuardHill Employment Agreement (Rogin Decl., Ex. T); Barenblatt Tr. at 77.

22.     On or about August 30, 2013, Ungar signed an employment agreement with GuardHill.  *See* Ungar/GuardHill Employment Agreement (Rogin Decl., Ex. U); Ungar Tr. at 67-68.

23.     All four defendants resigned from Apple, and began working at GuardHill, on September 3, 2013, the day after Labor Day.  *See* Breitstein Tr. at 222.

24.     Each Defendant's employment agreement with GuardHill required him "to send e-mail announcements to his database of clients and referral sources within the first 14 days" of his employment by GuardHill.  *See* Rogin Decl., Exs. R-U at ¶ 6; Breitstein Tr. at 95-96; Furer Tr. at 71; Barenblatt Tr. at 77-78; Ungar Tr. at 78-80.

25.     Prior to resigning, Barenblatt had previously used Apple documents and resources to further a separate business venture called "Plan B", without Apple's permission or authorization.  *See* Barenblatt Tr. at 237-40.

**Documents Taken By Breitstein From Apple**

26.     Approximately a week prior to resigning from Apple, and in anticipation of leaving Apple, Breitstein copied documents from his computer at Apple to a USB device.  *See* Breitstein Tr. at 103, 162-64.

27.     As identified on the foregoing USB device, included among the documents copied thereto by Breitstein were documents concerning Apple's business and more than 10,000 documents concerning individual Apple's clients, including: (i) loan applications (Form 1003s) (which contain such clients' dates of birth and social security numbers); (ii) client financial statements; (iii) bank statements; (iv) tax returns; (v) pay stubs; (vi) W-2s; and (vii) credit reports.  *See* Breitstein Tr. at 105, 166, 174-76, 190-92; Rogin Decl. ¶ 37.

28.     Subsequent to copying documents to the foregoing USB device from his computer at Apple, Breitstein neither added documents or files to that USB, nor deleted any from that USB.  *See* Breitstein Tr. at 186, 188.

29.     Subsequent to copying documents to the foregoing USB device from his computer at Apple, Breitstein deleted all such documents from his computer at Apple.  *See* Breitstein Tr. at 202-03.

30.     In anticipation of leaving Apple, Breitstein e-mailed documents on Apple's computer system to his personal e-mail address.  *See* Breitstein Tr. at 103.

31.     On August 26 and August 28, 2013, and in anticipation of leaving Apple, Breitstein printed Apple business documents off of Apple's computer system and removed them from Apple's premises.  *See* Breitstein Tr. at 103, 106.

32.     Among the documents that Breitstein printed from Apple's computers system and removed from Apple's premises were Outlook contact lists containing contact information for

5

customers, real estate brokers, bankers, lawyers, all of whom he came to know as an Apple MLO, in furtherance of Apple's business. *See* Breitstein Tr. at 111-22, 127-28.

33.     On August 29, 2013, Breitstein e-mailed, from Apple's computer system to his personal e-mail account, a list of clients he serviced at Apple. *See* Breitstein Tr. at 137-38.

34.     On August 29, 2013, Breitstein also e-mailed, from Apple's computer system to his personal e-mail account, documents for loan applications filed by Apple customers. These documents were comprised of borrower summaries (Form 1008s) and the first page of the loan application (Form 1003s). The Form 1008s that Breitstein e-mailed himself contained the borrower's social security number, and the Form 1003s taken by Breitstein contained the borrower's date of birth. *See* Breitstein Tr. at 131-33; Rogin Decl., Ex. V and ¶ 23.

35.     Breitstein did not have Apple's permission to copy to a USB device, e-mail to himself or print and remove, any of the information described in Paragraphs 27, 32, 33 and 34 above. *See* Breitstein Tr. at 141.

36.     Upon starting to work at GuardHill, Breitstein provided to GuardHill, for purposes of the issuance of an e-mail blast announcing that he was now working at GuardHill, a list of e-mail address for his contacts which he had taken from Apple. *See* Breitstein Tr. at 155-157.

37.     After resigning from Apple, Breitstein brought with him to GuardHill the USB device which contained the files copied from Apple's computer system. *See* Breitstein Tr. at 168.

38.     Subsequent to beginning to work at GuardHill, Breitstein connected to his computer at GuardHill the USB device that he had previously connected to his computer at Apple and onto which he copied documents from Apple's computer system. *See* Breitstein Tr. at

181-82, 184-85; Mamakas Report (Mamakas Aff., Ex. A) at ¶ 20 (identifying a USB with serial number "AA00000000002810" as having been connected to Breitstein's computer at Apple); GuardHill USB Log (Rogin Decl., Ex. W) at page Bates stamped "GUARDHILL 592" (identifying same USB device as having been connected to Breitstein's computer at GuardHill).

39.     Neither Breitstein nor Alan Rosenbaum, President of GuardHill, know if anyone at GuardHill has ever inspected Breitstein's computer at GuardHill to determine if any of the Apple customer confidential information was ever uploaded to his computer at GuardHill.  *See* Breitstein Tr. at 178; Rogin Decl., Ex. H [Rosenbaum Tr.] at 77-78, 99-100.

**Documents Taken By Furer From Apple**

40.     In anticipation of leaving Apple, Furer e-mailed to Geoff Sheerar, his personal outside marketing consultant, for Furer's own future use, numerous contact lists off of Apple's computer system, which included contact information for Apple customers, as well as for real estate brokers, financial advisors and referral sources who Furer developed as contacts by reason of his employment by Apple.  *See* Furer Tr. at 78-81, 110-119.

41.     In anticipation of leaving Apple, Furer had Breitstein print for him off of Apple's mortgage database, for various Apple clients, the Form 1008 and the first page of the Form 1003. *See* Furer Tr. at 81-84; Rogin Decl., Ex. X.

42.     Furer went into Apple's office on August 31, 2013, the Saturday before Labor Day, and retrieved the documents printed by Breitstein, who was also in Apple's office that day. *See* Furer Tr. at 84, 88, 92.

43.     Furer took the printed Form 1008s and Form 1003s (first pages) with him from Apple's office and brought them to GuardHill's office.  *See* Furer Tr. at 86, 105.

86894.1

44.    Furer knew that the forms that he took from Apple's office contained customer social security numbers on them.  *See* Furer Tr. at 91.

45.    Furer did not have Apple's permission to take the Form 1003s and 1008s which he took.  *See* Furer Tr. at 146.

46.    Furer, along with assistance of an employee or intern provided by GuardHill, input into GuardHill's computer system information contained on the client forms that he had taken from Apple.  *See* Furer Tr. at 106-07.

47.    On September 2, 2013 (Labor Day), Furer remotely accessed Apple's network and deleted (or had deleted by someone at his request) the contact lists at Apple that he had previously taken in anticipation of leaving.  *See* Furer Tr. at 151-55; Mamakas Report at ¶ 13; Rogin Decl., Ex. Y at page Bates stamped "DB 328".

48.    Furer caused these deletions because he did not want Apple to have his contacts. *See* Furer Tr. at 93, 155.

49.    Upon starting to work at GuardHill, Furer provided to GuardHill, for purposes of the issuance of an e-mail blast announcing that he was now working at GuardHill, a list of e-mail address for his contacts which he had taken from Apple.  *See* Furer Tr. at 148-49.

**Documents Taken By Barenblatt From Apple**

50.    Prior to starting at GuardHill, Barenblatt provided GuardHill with all of the contacts he developed at Apple, which included the contact information for Apple customers. *See* Barenblatt Tr. at 76.

51.    In anticipation of leaving Apple, Barenblatt copied files off of Apple's computer network onto two different external storage devices.  *See* Barenblatt Tr. at 92, 110-11, 131-32.

52.     The files copied by Barenblatt from Apple's network included the contact information for Apple clients.  *See* Barenblatt Tr. at 137-38, 156-63.

53.     Barenblatt did not have Apple's permission to copy any information, including Apple customer contact information, from Apple's network in anticipation of leaving Apple.  *See* Barenblatt Tr. at 46.

54.     Upon starting to work at GuardHill, Barenblatt connected at least one of these devices to his computer at GuardHill to upload certain documents to such computer.  *See* Barenblatt Tr. at 97, 121; Mamakas Report at ¶ 32 (identifying PNY and WD My Book devices by serial number as having been connected to Barenblatt's computer at Apple); GuardHill USB Log (Rogin Decl., Ex. W) at page Bates stamped "GUARDHILL 590," items (1) and (4) (identifying the same two devices as having been connected to Barenblatt's computer at GuardHill).

55.     Mr. Rosenbaum is not aware if anyone at GuardHill has ever inspected Barenblatt's computer at GuardHill to determine if any Apple documents were ever uploaded to his computer at GuardHill.  *See* Rosenbaum Tr. at 77-78; 99-100.

56.     Upon starting to work at GuardHill, Barenblatt provided to GuardHill, for purposes of the issuance of an e-mail blast announcing that he was now working at GuardHill, a list of e-mail address for his contacts which he had taken from Apple.  *See* Barenblatt Tr. at 163-65.

57.     From August 27, 2013 through the morning of September 3, 2013 before Barenblatt resigned from Apple, he deleted numerous files and folders from the Apple computer network.  *See* Barenblatt Tr. at 167-68; Mamakas Report at ¶¶ 25-28.

**Documents Taken By Ungar From Apple**

58.     In anticipation of leaving Apple, Ungar forwarded to his wife's e-mail address numerous contact lists off of Apple's computer system, which included contact information for Apple customers, as well as for real estate brokers and referral sources who Ungar developed as contacts by reason of his employment by Apple.  He thereafter e-mailed these lists from his wife's personal e-mail account to his e-mail address at GuardHill.  *See* Ungar Tr. at 111-34.

59.     In anticipation of leaving Apple, Ungar had Breitstein print for him off of Apple's mortgage database, for various Apple clients, the Form 1008 and the first page of the Form 1003 completed by such clients.  *See* Ungar Tr. at 85-87, 90, 92-93, 135-39, 141-42, 298-99; Rogin Decl., Exs. X, Z, AA and ¶ 27.

60.     Ungar went into Apple's office on August 31, 2013, the Saturday before Labor Day, and retrieved the documents printed by Breitstein, who was also in Apple's office that day. *See* Ungar Tr. at 86-87.

61.     Ungar took the printed Form 1008s and Form 1003s (first pages) with him from Apple's office and brought them to GuardHill's office.  *See* Ungar Tr. at 90, 93.

62.     Ungar did not have Apple's permission to take the Form 1003s and 1008s which he took.  *See* Ungar Tr. at 301.

63.     Upon starting to work at GuardHill, Ungar provided to GuardHill, for purposes of the issuance of an e-mail blast announcing that he was now working at GuardHill, a list of e-mail address for his contacts which he had taken from Apple.  *See* Ungar Tr. at 127, 145-46.

**Defendants' Damage Claims and Calculations**

64.     Defendants claim only three substantive categories of damages (independent of interest, attorneys' fees and liquidated damages):  (i)  unpaid commissions on deals they

originated prior to resigning from Apple (only a few of which closed before they left Apple); (ii) unpaid bonuses (also referred to as unpaid prior commissions); and (iii) improper deductions. *See* Defendants' Revised Damage Calculation (Rogin Decl., Ex. BB); Breitstein Tr. at 314; Furer Tr. at 199-200; Ungar Tr. at 247.

### a. Unpaid Commissions

65.     An Apple mortgage loan officer was not entitled to receive a commission until loans closed and funded.  *See* Breitstein Tr. at 268-69; Ungar Tr. at 262.

66.     Defendants seek commissions on deals they originated prior to resigning from Apple in the following amounts:  (i) Breitstein -- $9,463.12; (ii) Furer -- $36,862.60; (iii) Barenblatt -- $64,366.42; and (iv) Ungar -- $16,621.  *See* Rogin Decl., Ex. BB.  Breitstein's and Ungar's totals each include $3,750 for a borrower (Hort) whose loan never closed.  *See id.*; Breitstein Tr. at 255; Ungar Tr. at 242-43.

67.     Of these totals, only the following amounts were on deals which closed before September 3, 2013, as follows:  (i) Furer -- $14,265.91 (clients Iwashiro, Kennedy, Zale) (*see* Rogin Decl., Ex. CC); (ii) Barenblatt -- $6,127.25 (clients Shein, Smith-Williams) (*see* Rogin Decl., Ex. DD); and (iii) Ungar -- $5,865 (clients Sirken, Naple) (*see* Rogin Decl., Ex. EE); Furer Tr. at 192, 207.

68.     In addition as part of this category, Furer seeks just under $6,000 for something called "Jimmy Mamakas Override," a claimed entitlement which is not the subject of any written agreement with Apple.  *See* Rogin Decl., Ex. BB; Furer Tr. at 196.

69.     Regarding the claimed commissions on deals that closed after Defendants resigned from Apple – the vast majority of Defendants' unpaid commission claim – none of the Defendants performed any of the tasks necessary to bring such deal to closing and generate a

commission for Apple, subsequent to their resignation.  *See* Breitstein Tr. at 278-85; Furer Tr. at 207-12; Barenblatt Tr. at 209-10; Ungar Tr. at 253-59.

### b.  Unpaid "Bonuses"

70.     Defendants seek "Unpaid Prior Commission Amounts", or what they also termed bonuses, as follows:  (i) Breitstein -- $6,364.59; (ii) Furer -- $$20,996; (iii) Barenblatt -- $12,000; and (iv) Ungar -- $10,000.  *See* Rogin Decl., Ex. BB; Breitstein Tr. at 256-57; Barenblatt Tr. at 201; Ungar Tr. at 243.

71.     Regarding these claimed bonuses, all Defendants base these claimed damages on provisions of their respective compensation agreements which provide that they were "eligible" for certain payments from Apple.  *See* Compensation Agreements (Rogin Decl., Exs. N-Q) at 1; Breitstein Tr. at 258-59; Furer Tr. at 196, 202-03; Barenblatt Tr. at 50, 202; Ungar Tr. at 251.

### c.  Improper Deductions

72.     Defendants claim damages from improper deductions from 2008 through 2013 in the following amounts:  (i) Breitstein -- $43,056; (ii) Barenblatt -- $32,292; and (iii) Ungar -- $32,292.  *See* Rogin Decl., Ex. BB.

73.     Furer does not allege that he suffered any damages from alleged improper deductions made from 2008 through 2013.  *See id.*

74.     All Defendants also claim damages for alleged improper deductions occurring before 2008, which was more than six years prior the filing of Defendants' counterclaims.  *See id.*

75.     Defendants' claim for improper deductions is based upon the alleged improper deduction of $276 from the total commissions to be paid to them during each bi-weekly pay

period when they were paid commissions.  Breitstein Tr. at 290; Furer Tr. at 215; Barenblatt Tr. at 224-25; Ungar Tr. at 263.

76.     Defendants each prepared their own worksheets calculating the amount of commissions they were owed, which they then submitted to Apple, and in which Defendants included the $276 deduction that is the subject of the improper deduction claim.  *See* Defendants' Commission Worksheets (Rogin Decl., Exs. FF-II); Breitstein Tr. at 289-296; Furer Tr. at 213-16; Barenblatt Tr. at 224-25; Ungar Tr. at 260-62, 267-68, 280-81.  Furer's Commission Worksheets (Rogin Decl., Ex. GG) do not reflect the $276 deduction, as they are from 2008-2013, a period for which Furer does not claim "improper deduction" damages.

77.     Breitstein, Barenblatt and Ungar each acknowledged that their commissions were not earned until the foregoing $276 was deducted.  *See* Breitstein Tr. at 299; Barenblatt Tr. at 225, 227, 232; Ungar Tr. at 280.


Dated: New York, New York
       June 19, 2015

                              BERGER & WEBB LLP

                              By: _____
                                  Jonathan Rogin
                                  jrogin@bergerwebb.com

                                  7 Times Square, 27th Floor
                                  New York, New York 10036
                                  212-319-1900

                                  *Attorney for Plaintiff Apple Mortgage Corp.*