UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

APPLE MORTGAGE CORP.,

                Plaintiff,

-against-

RICHARD BARENBLATT, KEITH FURER,
DAVID BREITSTEIN and KEVIN UNGAR,

                Defendants.

------------------------------------------------------------- x

Civil Action No. 13 CV 9233 (JGK)

**AFFIDAVIT OF DAVID BREITSTEIN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

DAVID BREITSTEIN, being duly sworn, deposes and says:

        1.    I am a Defendant in this action and I make this affidavit in support of our motion for summary judgment. I am over 18 years of age, and this affidavit is based upon my personal knowledge, except for matters set forth upon my information and belief, which is so stated where applicable.

**My Employment With Apple
and the Compensation Agreement**

        2.    I was employed by Plaintiff Apple Mortgage Corp. ("Apple") from 2002 until I resigned on September 3, 2013. Apple's President and my direct supervisor was Eric Appelbaum.

        3.    At Apple, I understood that I was an "at-will" employee, and was not bound by any restrictive covenant, noncompete or nonsolicit provision limiting my post-employment activities. I was never required to sign a confidentiality or non-disclosure agreement.

4. I was compensated by Apple solely on a commission basis, and Apple did not pay any health benefits.

5. I was entitled to commissions on loans originated by me, and I was paid after the loans closed and Apple received its fee.

6. The terms of my compensation was set forth in a Compensation Agreement drafted and executed by Apple, which is attached hereto as Exhibit 1. The Compensation Agreement was drafted by Mr. Appelbaum without any input from me or the other loan originators working at Apple.

7. The Compensation Agreement begins with the following declaration: "Henceforth, **this agreement will be the sole agreement regarding compensation** between Apple Mortgage Corp. and [the Defendant] (hereinafter "LO"). Apple Mortgage Corp. agrees to compensate the LO based on the following terms." (Emphasis added.)

8. The Compensation Agreement provides the formula for commissions as follows:

> Your Compensation will be based on 50% of the loan amount and **cannot vary from one transaction to another**. First $400 will be reduced from 1% of the loan amount. Then your compensation will be 50% of the remainder.
> (Emphasis added.)

The Compensation Agreement does not state that I had to be employed at the time the loan closed to be compensated, or that I had to be involved in the closing.

9. The Compensation Agreement further provided for bonuses to be paid if certain achievements were met, such as originating more loans than in the same quarter the prior year, having applicants who have communicated their satisfaction to Apple, originating loans through new referral sources, and closing a large percentage of the loans submitted.

10. In practice, although the amounts were discretionary under the Compensation Agreement, Apple agreed orally to pay such amounts in regular quarterly intervals and did so at all times prior to my departure.

11. As noted in the Compensation Agreement, there were no other agreements regarding compensation between Apple and me. The Compensation Agreement memorialized the terms of the agreement between that had been in place prior to that.

12. In or about 2003, I was provided with an Employee Handbook (the "Handbook") and asked to sign an "Employee Acknowledgement Form" verifying receipt, copies of which are attached hereto as Exhibit 2. I understood that the Handbook was drafted by Mr. Appelbaum. I did not have any input,.

13. The Handbook did not deal at all with my compensation. I did not understand it to be a contract between me and Apple as it stated, among other things:

> The policies in this handbook are not intended to create a contract. The policies should not be construed to constitute contractual obligations of any kind or a contract of employment between [Apple] and any employee.
> (Handbook at Section 101: Nature of Employment.)
>
> I understand and acknowledge that this handbook is not a contract of employment or a legal document.
> (Employee Acknowledgement Form.)

14. Accordingly, there are no contracts concerning the compensation owed to me except for the Compensation Agreement.

### The Additional Charges to My Commissions

15. The commissions paid to me in fact varied from the calculations set forth in the Compensation Agreement. In addition to the formula I agreed to in that document, I was subjected to charges or downward adjustments that decreased the amount I was ultimately paid.

16. Contrary to the Compensation Agreement, Apple reduce my percentage by ten basis points – from 50% to 40% for – for any loans where the leads were supposedly given to me by Apple.

17. At times I was also charged for advertising costs, despite the lack of any written agreement providing for such.

18. In addition to these adjustments, from the commencement of my employment until my resignation in 2013, Apple imposed a $276 charge in each pay period. This charge was assessed after the amounts were calculated pursuant to the Compensation Agreement, and it was referred to by Apple with the description "FICA."

19. The $276 was not the share of FICA that I paid out of my earnings. That portion was deducted separately by the outside payroll company that issued paychecks for Apple. The $276 was taken out before the payroll company deducted any taxes.

20. The $276 charge was imposed years ago by Apple, and we were told that its purpose was to cover the employer's FICA contribution. Mr. Appelbaum explained to me that Apple contributed an amount equal to 7.2% of each employee's annual salary. He said that he approximated that the average Apple employee made $100,000 a year in commissions, generating an employer FICA contribution of $7,200 annually. By charging $276 in each of the 26 pay periods each year, Mr. Appelbaum told me that Apple could recoup this amount.

21. I learned towards the end of my employment at Apple that some loan originators were not charged the $276 fee and for others it was discontinued at various times. I typically produced the lowest commissions of the four Defendants in this case, but the charges were imposed through his final Apple paycheck. As such, I now believe that the charge was a penalty of sorts imposed by Apple.

4

22. I was never asked or given any choice, and I never agreed to have an additional $276 taken out of each paycheck. Instead, the charge was imposed by Appelbaum. In the course of leaving Apple and talking to the other Defendants, we learned for the first time that not every employee paid the FICA deduction, and that it had been suspended for different Apple employees at different times.

23. The charges for leads, advertising and "FICA" were set forth on commission worksheets that Apple required to be submitted before it would pay any commissions. The charge for leads would be applied to determine the "gross commission" amount and the other charges would be applied to determine a net commission. I physically created the template of the commission worksheet that I used over the years, but I did so following the dictates of Mr. Appelbaum. I knew he would not pay me at all if I did not include the charges at issue.

24. The $276 charge was taken from every paycheck to me from the beginning of my employment until I left in 2013. Because I did not generate commissions in every pay period, I did not receive a paycheck every two weeks. Typically, when there was a pay period missed, Apple would double the $276 charge in the next pay period. Accordingly, I believe that the total amount of the "FICA" charges taken from me is as much as $80,131.91. We asked Apple to produce records of the charges in this litigation, but they did not produce documents sufficient for us to calculate the totals.

25. I understand that Apple is asserting that, as a legal matter, my commissions were not "earned" until the charges for FICA were applied. And I gather that Apple is construing some of the answers at my deposition – to questions asked by its counsel using the word "earned" – to support its argument in this regard. I do not know when, as a legal

matter, my commissions were "earned" and I certainly did not mean to testify to that effect. I do not recall any discussion at Apple or any documents indicating when commissions were earned.

26.     But what I believed at the time, what I believe today, and what I will testify to at trial is the following. As a loan officer compensated by commission only, I understood that I was entitled to my commission if and when I matched a willing borrower with a willing lender. Of course the mortgage had to close before Apple or I got paid, but that did not change the nature of the work I was being paid for. I was paid to originate loans, not to close them. Apple had processors on staff who routinely handled the minutia.

27.     If I procured a willing borrower and a willing lender, and the loan closed, I was entitled to be paid according to the formula set forth in my Compensation Agreement, which was written by Mr. Appelbaum himself.

28.     All of the other charges – for leads provided, advertising and FICA – were extra fees imposed on me by Mr. Appelbaum after the fact. I could not get my check – any check – unless those items were included on the commission statement.

29.     Moreover, I was not aware at the time that these charges were imposed at the whim of Mr. Appelbaum, inconsistently amongst the loan originators as determined by him on a basis I can only imagine. Particularly because the charges were not uniformly applied to all loan officers, I object to the notion that they were part of the calculation of our commissions. They were adjustments imposed after the fact. And the idea that, after years of imposing these charges, unfairly and under false pretenses, taking money from me and my family, Mr. Appelbaum has the utter temerity to question *my* loyalty is really beyond my comprehension.

## My Departure From Apple

30.     On September 3, 2013, I resigned my employment with Apple, and commenced employment with GuardHill Financial Corporation ("GuardHill").

2225326_1

31. I left Apple because I felt limited by the platform. Apple was a mortgage broker only, and I thought it would be better to work for a company that is both a mortgage broker and a mortgage banker, and that I would be able to offer more products to my clients and significantly enhance my business.

32. A large number of the important banks who previously did business with Apple had ceased to do so, including prominent financial institutions like Chase, CitiMortgage and Wells Fargo. As a result, Apple had grown increasingly uncompetitive and my livelihood was being jeopardized.

33. Many of us had raised concerns about this and Mr. Appelbaum told us time and again that Apple was going to get a banking license with the New York State Department of Banking. But it never happened and I could not wait any longer.

34. I really enjoyed my years at Apple. I loved the people and felt allegiance to the company. But I decided that moving to GuardHill was necessary to grow and develop my business.

**The Unpaid Commissions**

35. When I left Apple, I was owed commissions and bonuses on loans that had closed, and I had originated some other loans that would be closing soon. After I left, I asked Apple to pay me the following amounts:

| | |
|---|---|
| Hort | $3,750 (25% split) |
| Egan | $4,475.63 |
| Singh | $912.50 (25% split) |
| Leung | $825 (25% split) |
| Processing Fees | ($500) |
| Commission Total | $9,463.13 |
| Unpaid Prior Comms. | $6,364.59 est. |
| Total | $15,827.72 |

36. I know that Apple has complaints about various things I did in getting ready to resign, which I address below, but I do not believe it has any complaints about my loyalty in producing the loans that generated these commissions and bonuses, and I believe I am entitled to receive the agreed-upon compensation. Nonetheless, Apple has not paid me for any of them.

37. Instead, Apple sued me.

**The Alleged Taking and Deleting of Information by Defendants**

38. Apple was the first job I had in the mortgage origination industry and I was there a long time. Leaving for another company was new territory for me. I did my best to move on with dignity and class, without doing anything that would harm Apple, and without doing anything inappropriate.

39. In any event, I do not believe I did anything that justified Apple withholding the commissions it owed me or filing a federal law suit.

**Outlook Contact Lists**

40. Over the years while I was employed by Apple, I maintained an Outlook contact database, which included personal contacts, business-related contacts such as colleagues and potential referral sources, and past clients who had worked on loans with me. This database was maintained by me alone – nobody else at Apple did any work on it. I was not paid to keep a contact list or update my Outlook contacts, nor did anyone ever tell me that the contents belonged to Apple. They are my contacts, so I do not understand how Apple could own them.

41. My Outlook contacts had contained names, addresses, telephone numbers and email addresses. It did not include social security numbers, account numbers, lists of assets, credit ratings, customer preferences, or information regarding prior mortgages or other financial transactions.

42. Each loan originator at Apple – and there were as many as 20 loan originators at a time – maintained his own Outlook contact database. The databases were not comingled or shared.

43. If I had to, I could have reproduced most of my Outlook contact database from scratch. Most of my referral sources are real estate attorneys and real estate brokers, who are easily found on the internet. I could find the past clients because I know their names and addresses (having helped them get mortgages). Others in my Outlook contacts were family and friends who I could easily find. And many of the contacts are connected to me on LinkedIn.

44. There were no policies or procedures at Apple specifically regarding the maintenance of Outlook contact databases. I was never asked to sign a non-disclosure agreement.

45. Other employees had left Apple in the past and I know they took their Outlook contacts with them. I never heard Mr. Appelbaum complain about that until the other Defendants and I left.

46. I believe that any new employer in the industry would have expected me to bring my contacts. In fact, it was a term of our employment agreement, with GuardHill to notify my contacts of my new job.

47. Thus, I believed – and I still believe – that I had every right to take a copy of my Outlook contact list when I left Apple.

**Other Information and Documents**

48. In addition to making sure I had my Outlook contact list, I wanted to secure personal information and potentially useful forms. To keep it simple, and to make sure I had everything, I simply backed up my entire "H" drive to an external drive. Then, before leaving Apple, I deleted the "H" drive from my computer at Apple. I did not want to leave

2225326_1

behind any personal items, which had accumulated over more than ten years. And I did not believe that Apple had any use for the other information on the drive. Any client documents were simply copies of files kept elsewhere at Apple. Mr. Appelbaum had told us many times not to leave extraneous material on Apple's servers, to preserve space, and I thought my deletions were consistent with that instruction.

49. Apple had no policy for maintaining electronic copies of client data. Documents that came in electronically were printed and placed in a hard copy file. In the normal course of action, most brokers would then delete the emails containing the electronic attachments they printed and filed. Thus, the deletion of any copies of client materials from my "H" drive was of absolutely no consequence to Apple's actual client files or its business.

50. When we received a letter from Apple's lawyer a couple weeks after leaving Apple, we retained counsel and I provided him with the external drive containing the "H" drive that I had copied. I have not had possession of or used the external drive since, but I understand that Apple was able to review it as part of discovery in this case.

51. In addition to that, I wanted to make sure I had email addresses and birth dates for all of my clients. To do that, I printed some summary sheets from the Encompass database at Apple– which contained information on mortgages completed at Apple – and I helped Mr. Furer and Mr. Ungar do the same. We only printed sheets for our own clients and we only intended to use them to get email addresses and birthdates for clients they had served in the past. We were not interested in or planning to use social security numbers or any of the other financial data on these forms, and I never used any of that information. In fact, I ended up throwing out the printed forms without having used them at all or showing them to anybody.

52.     I did not delete anything from the Encompass database or anywhere at Apple other than my "H" drive, as explained above. At no time did I delete any information with the intention of causing harm to Apple or its business.

53.     Other than the Outlook contact lists, I have not utilized any business information taken from Apple since my departure, nor have I provided such information to any other person. And all such information in my possession, custody or control has been provided to Apple in the course of this litigation.

54.     At Apple, I was required to buy my own cell phone, which I took with me when I left. For a few days thereafter, I continued to receive some emails at my Apple address. I did not access or attempt to access Apple's computer system at any time following my resignation.

55.     When I started at GuardHill, I had my contacts put on the system and we sent an email blast telling everyone that I had a new job. The blast I sent is attached hereto as Exhibit 3.

56.     Other than my Outlook contacts, I have not utilized any information from Apple, or provided any Apple information to anyone else. I have not used any personal information of Apple clients, such as social security numbers, credit ratings, asset and salary information, or even birthdates, that I acquired while I was employed by Apple.

**My Loan Originations at GuardHill**

57.     I understand that the damages sought by Apple in this case are in part based on three of the loans that I have originated at GuardHill since joining.

58.     Anthony DiPolvere was referred to me by a former client after I joined GuardHill. I did not know him or deal with him at Apple. His loan application at GuardHill was

11

2225326_1

dated May 22, 2014, months after Apple stopped taking applications. His loan was placed at Redwood, a bank that was no longer doing business with Apple at the time of my departure.

59. David Ehrich was also referred to me by a friend after I joined GuardHill. I did not know him or deal with him at Apple. His application at GuardHill was taken on April 8, 2014, also after Apple stopped taking applications.

60. Takashi Iwata is a personal friend who I have known for about 20 years. I believe he sat at a table with Mr. Appelbaum at my wedding in 2004. I did help him with a loan at Apple, and he contacted me at GuardHill to help with another loan.

61. I find it preposterous that Apple believes it is entitled to damages in connection with any of these loans. None of these clients were procured through illicit means and I did not use any information taken from Apple in connection with their loans.

_____
David Breitstein

Sworn to before me this
17th day of June, 2015

_____
Notary Public

JOAN F RUSSO
Notary Public State of New York
No. 01RU5056074
Qualified in Queens County
Commission Expires Jan. 29, 2016