UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

APPLE MORTGAGE CORP.,

                        Plaintiff,

        -against-

RICHARD BARENBLATT, KEITH FURER,
DAVID BREITSTEIN and KEVIN UNGAR,

                        Defendants.

-------------------------------------------------------------- x

:
: Civil Action No. 13 CV 9233 (JGK)
:
:
:
: **AFFIDAVIT OF RICHARD**
: **BARENBLATT IN SUPPORT OF**
: **DEFENDANTS' MOTION FOR**
: **SUMMARY JUDGMENT**
:
:
:
:

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF NEW YORK   )

        RICHARD BARENBLATT, being duly sworn, deposes and says:

        1.      I am a Defendant in this action and I make this affidavit in support of our

motion for summary judgment.  I am over 18 years of age, and this affidavit is based upon my

personal knowledge, except for matters set forth upon my information and belief, which is so

stated where applicable.

**My Employment With Apple**
**and the Compensation Agreement**

        2.      I was employed by Plaintiff Apple Mortgage Corp. ("Apple") from

November 1998 until I resigned on September 3, 2013.   Apple's President and my direct

supervisor was Eric Appelbaum.

        3.      At Apple, I understood that I was an "at-will" employee, and was not

bound by any restrictive covenant, noncompete or nonsolicit provision limiting my post-

employment activities.  I was never required to sign a confidentiality or non-disclosure

agreement.

1

4.     I was compensated by Apple solely on a commission basis, and Apple did not pay any health benefits.

5.     I was entitled to commissions on loans originated by me, and I was paid after the loans closed and Apple received its fee.

6.     The terms of my compensation was set forth in a Compensation Agreement drafted and executed by Apple, which is attached hereto as Exhibit 1.   The Compensation Agreement was drafted by Mr. Appelbaum without any input from me or the other loan originators working at Apple.

7.     The Compensation Agreement begins with the following declaration: "Henceforth, **this agreement will be the sole agreement regarding compensation** between Apple Mortgage Corp. and [the Defendant] (hereinafter "LO"). Apple Mortgage Corp. agrees to compensate the LO based on the following terms." (Emphasis added.)

8.     The Compensation Agreement provides the formula for commissions as follows:

> Your Compensation will be based on 55% of the loan amount and **cannot vary from one transaction to another**. First $400 will be reduced from 1% of the loan amount. Then your compensation will be 55% of the remainder. (Emphasis added.)

The Compensation Agreement does not state that I had to be employed at the time the loan closed to be compensated, or that I had to be involved in the closing.

9.     The Compensation Agreement further provided for bonuses to be paid if certain achievements were met, such as originating more loans than in the same quarter the prior year, having applicants who have communicated their satisfaction to Apple, originating loans through new referral sources, and closing a large percentage of the loans submitted.

2

10.     In practice, although the amounts were discretionary under the Compensation Agreement, Apple agreed orally to pay such amounts in regular quarterly intervals and did so at all times prior to my departure.

11.     As noted in the Compensation Agreement, there were no other agreements regarding compensation between Apple and me.  The Compensation Agreement documented the terms of the agreement that had been in place prior to that.

12.     In or about 2003, I was provided with an Employee Handbook (the "Handbook") and asked to sign an "Employee Acknowledgement Form" verifying receipt, copies of which are attached hereto as Exhibit 2.  I understood that the Handbook was drafted by Mr. Appelbaum.  I did not have any input,.

13.     The Handbook did not deal at all with my compensation.  I did not understand it to be a contract between me and Apple as it stated, among other things:

> The policies in this handbook are not intended to create a contract.  The policies should not be construed to constitute contractual obligations of any kind or a contract of employment between [Apple] and any employee.
> (Handbook at Section 101: Nature of Employment.)

> I understand and acknowledge that this handbook is not a contract of employment or a legal document.
> (Employee Acknowledgement Form.)

14.     Accordingly, there are no contracts concerning the compensation owed to me except for the Compensation Agreement.

## The Additional Charges to My Commissions

15.     The commissions paid to me in fact varied from the calculations set forth in the Compensation Agreement.   In addition to the formula I agreed to in that document, I was subjected to charges or downward adjustments that decreased the amount I was ultimately paid.

3

16.     Contrary to the Compensation Agreement, Apple reduce my percentage by ten basis points – from 55% to 45% for – for any loans where the leads were supposedly given to me by Apple.

17.     In addition to these adjustments, from the beginning of my employment until approximately July 2012, Apple took $276 from my commissions in each pay period.  This charge was assessed after the amounts were calculated pursuant to the Compensation Agreement, and it was referred to by Apple with the description "FICA."

18.     The $276 was not the share of FICA that I paid out of my earnings.  That portion was deducted separately by the outside payroll company that issued paychecks for Apple.  The $276 was taken out before the payroll company deducted any taxes.

19.     The $276 charge was imposed years ago by Apple, and we were told that its purpose was to cover the employer's FICA contribution.

20.     I learned towards the end of my employment at Apple that some loan originators were not charged the $276 fee and for others it was discontinued at various times.  In or about July 2012, Mr. Appelbaum told me he would stop charging me the $276.  He told me at the time not to tell anyone.

21.     Prior to that, I was never asked or given any choice, and I never agreed to have an additional $276 taken out of each paycheck.  Instead, the charge was imposed by Appelbaum.  In the course of leaving Apple and talking to the other Defendants, we learned for the first time that not every employee paid the FICA deduction, and that it had been suspended for different Apple employees at different times.

22.     The charges for leads and "FICA" were set forth on commission worksheets that Apple required to be submitted before it would pay any commissions.  The

4

charge for leads would be applied to determine the "gross commission" amount and "FICA" charges would be applied to determine a net commission.

23.    The $276 charge was taken from every paycheck to me from some time in 2001 until I left in 2013.  Accordingly, I believe that the total amount of the "FICA" charges taken from me is as much as $82,524.00.  We asked Apple to produce records of the charges in this litigation, but they did not produce documents sufficient for us to calculate the totals.

24.    I understand that Apple is asserting that, as a legal matter, my commissions were not "earned" until the charges for FICA were applied.  I do not know when, as a legal matter, my commissions were "earned."  I do not recall any discussion at Apple or any documents indicating when commissions were earned.  When I was asked at my deposition if my commission was "earned" after the FICA deduction, I thought I was just being asked if I only got paid after the deduction, which is correct.

25.    But what I believed at the time, what I believe today, and what I will testify to at trial is the following.  I was a loan officer compensated by commission only, and I was entitled to my commission if and when I matched a willing borrower with a willing lender. Apple did not give me my commission check until the loan closed and Apple got paid its fee, but I earned the commission when I brought together the borrower and the lender.  I was paid to originate loans, not to close them.  That's what the processors on staff were for.

26.    The charges for leads and FICA were required by Mr. Appelbaum.  I could not get paid by him unless those items were included on the commission statement.

27.    I did not learn at the time that these charges were imposed at the whim of Mr. Appelbaum, for reasons only he knows.  They were not part of the calculation of our commissions.  They were adjustments imposed after the fact.  He took this money from us for

5

years, unfairly and without being honest about what he was doing.  He took money from me and my family, and he should be ashamed now to be claiming that we are the ones who have been disloyal.

**My Departure From Apple**

        28.     On September 3, 2013, I resigned my employment with Apple, and commenced employment with GuardHill Financial Corporation ("GuardHill").

        29.     For some time, in addition to working as a loan originator, I have been working on a start-up website called "Who Lends Here" (www.wholendshere.com).  Mr. Appelbaum was well aware that I was working on the project.  I left Apple in part because I thought it would be beneficial in the development of my website.  In addition, I hoped that moving to a platform that could serve as a mortgage broker or a mortgage banker would be good for my loan origination business.

        30.     Prior to my departure, a number of the banks who previously did business with Apple had stopped doing so, including Chase, CitiMortgage and Wells Fargo, which are key lenders in the New York City real estate market.  As a result, Apple had grown increasingly uncompetitive and my livelihood was being jeopardized.

        31.     Many of us had raised concerns about this and Mr. Appelbaum told us time and again that Apple was going to get a banking license with the New York State Department of Banking. But it never happened and I could not wait any longer.

        32.     I was conflicted leaving Apple.  I had been there for 15 years and I felt it was my home.  But the time had come to move on and I needed to do what was right for my business and my family.

2225569_1

**The Unpaid Commissions**

33.     When I left Apple, I was owed commissions and bonuses on loans that had closed, and I had originated some other loans that would be closing soon.  After I left, I asked Apple to pay me the following amounts:

| | |
|---|---|
| Monteagudo | $5,830 |
| Shein | $1,441 |
| Smith-Williams | $4,716.25 |
| Japp | $8,085 |
| Glowczewski | $4,290 |
| Von Sengbusch | $5,125 |
| Williams | $5,637.50 |
| Williams | $2,516.25 |
| Meldelsohn | $1,756.80 (45% split) |
| Ricketts | $1,650 |
| Chapman | $4,494.87 |
| Fraser | $1,552.50 (45% split) |
| Gibson | $2,854.40 |
| Green-Lunn | $2,931.50 |
| Hirsch | $4,974.75 |
| Macpherson | $2,095.50 |
| Simonelli | $1,375 |
| Slater | $4,438.50 |
| Processing Fees | ($4,320) |
| Commission Total | $64,366.42 |
| Unpaid Prior Comms. | $12,000 est. |
| **Barenblatt Total:** | **$76,366.42** |

34.     When I told Mr. Appelbaum I was leaving, I asked him to do the right thing by me.  But he said right from the outset that he felt I had "betrayed" him by deciding to go somewhere else.  I do not believe that is true, and in any event I was completely loyal in producing all of the loans that generated these commissions and bonuses.  I believe I am entitled to receive the commissions and bonuses I am owed.  Nonetheless, Apple has not paid me for any of them.

35.     Instead, Apple sued me.

7

**My Preparations In Departing Apple**

36.     Apple was the first job I had in the mortgage origination industry and I was there for 15 years.  I had no experience leaving one company for another, but I tried my best to do it properly, without causing harm to Apple and without doing anything inappropriate.

37.     In any event, I do not believe I did anything that justified Apple withholding the commissions it owed me or filing a federal law suit.

**Outlook Contact Lists**

38.     Over the years while I was employed by Apple, I maintained an Outlook contact database, which included personal contacts, business-related contacts such as colleagues and potential referral sources, and past clients who had worked on loans with me.  This database was maintained by me alone – nobody else at Apple did any work on it.  I was not paid to keep a contact list or update my Outlook contacts, nor did anyone ever tell me that the contents belonged to Apple.  They are my contacts, so I do not understand how Apple could own them.

39.     My Outlook contacts had contained names, addresses, telephone numbers and email addresses.  It did not include social security numbers, account numbers, lists of assets, credit ratings, customer preferences, or information regarding prior mortgages or other financial transactions.

40.     Each loan originator at Apple – and there were as many as 20 loan originators at a time – maintained his own Outlook contact database.  The databases were not comingled or shared.

41.     If I had to, I could have reproduced most of my Outlook contact database from scratch.  Most of my referral sources are real estate attorneys and real estate brokers, who are easily found on the internet.  I could find the past clients because I know their names and

8

addresses (having helped them get mortgages).  Others in my Outlook contacts were family and friends who I could easily find.  And many of the contacts are connected to me on LinkedIn.

42.     There were no policies or procedures at Apple specifically regarding the maintenance of Outlook contact databases.  I was never asked to sign a non-disclosure agreement.

43.     Other employees had left Apple in the past and I know they took their Outlook contacts with them.  I never heard Mr. Appelbaum complain about that until the other Defendants and I left.

44.     I believe that any new employer in the industry would have expected me to bring my contacts.  In fact, it was a term of our employment agreement with GuardHill to notify my contacts of my new job.

45.     Thus, I believed – and I still believe – that I had every right to take a copy of my Outlook contact list when I left Apple.

### Other Information and Documents

46.     Prior to leaving Apple, I copied certain materials to several external drives for use going forward.  My intent was to secure: (a) purely personal items; (b) items related to a website I was developing; and (c) forms that might be of general use in the future.  Following the receipt of the September 17, 2013 letter from Apple's counsel, I surrendered all of the external drives I believed might contain information that came from Apple to my lawyer in this matter. When Apple raised concerns that other drives might have copies of some of the information, I provided those drives to my counsel, and all such drives, and any other information taken from Apple, have been provided to Apple for inspection and review in this litigation.

47.     I did not print, download or copy any information from the Encompass database at Apple in preparation for leaving, nor did I take any such materials or loan files with me.

48.     I did not delete anything from the Encompass database.  I may have deleted some items in the course of cleaning up my files and getting ready to leave, but none of that was meant to deprive Apple of information or cause harm to its business.  Indeed, Mr. Appelbaum had admonished us repeatedly to remove extraneous material from Apple's systems, which were limited in space.

49.     Other than the Outlook contact lists, I have not utilized any business information taken from Apple since my departure, nor have I provided such information to any other person.  And all such information in my possession, custody or control has been provided to Apple in the course of this litigation.

50.     At Apple, I was required to buy my own cell phone, which I took with me when I left.  For a few days thereafter, I continued to receive some emails at my Apple address. I did not access or attempt to access Apple's computer system at any time following my resignation.

51.     When I started at GuardHill, I had my contacts put on the system and we sent an email blast telling everyone that I had a new job.  The blast I sent is attached hereto as Exhibit 3.

52.     Other than my Outlook contacts, I have not utilized any information from Apple, or provided any Apple information to anyone else.  I have not used any personal information of Apple clients, such as social security numbers, credit ratings, asset and salary information, or even birthdates, that I acquired while I was employed by Apple.

**My Loan Originations at GuardHill**

53.     I understand that the damages sought by Apple in this case are in part based on three of the loans that I have originated at GuardHill since joining.

54.     Thomas Engelhardt and Nancy Garrity came to me when I was at Apple, but we could not place the loan at a compatible interest rate.  At GuardHill, I was able to help them get a loan at Redwood, a bank which never did business with Apple.

55.     Herzel Ephrat first made an inquiry while I was at Apple, but he had not identified any property and did not submit a purchase.  Subsequently, he reached out to me at GuardHill and I was able to help him get a loan at CitiMortgage, another bank which no longer did business with Apple.

56.     Nancy Hawley also  tried to refinance at Apple, but was unable to get her loan closed.  At GuardHill, I was able to help her get a loan at CitiMortgage, a bank which no longer did business with Apple.

57.     Joel Horovitz and Niki Flacks first made an inquiry while I was at Apple, having been introduced to me by one of my lawyers.  They were not yet in contract to purchase a home.  At GuardHill, I was able to help them get a loan at Chase, yet another bank which no longer did business with Apple.

58.     Conrad and Marianne Johnson were never Apple clients.  They were introduced to me after I began at GuardHill and ended up getting a loan from CitiMortgage.

59.     Craig Kobes first made an inquiry while I was at Apple, but he had not identified any property and did not submit a purchase.  Subsequently, he reached out to me at GuardHill and I was able to help him get a loan at Flagstar.  His application was taken on March 5, 2014, after Apple had stopped taking new loan applications.

60.     Arvind Krishnamurthy had worked with me at Apple on multiple transactions and he contacted me again at GuardHill.  I was able to help him get a loan at Chase, which no longer did business with Apple.  His application was taken on March 19, 2014, after Apple had stopped taking new loan applications.

61.     Joseph Lerner made an inquiry while I was at Apple regarding refinancing his primary residence, but the deal did not proceed.  He contacted me at GuardHill to work on a new purchase transaction.  I was able to help him get a loan at EverBank, again a bank that no longer did business with Apple.

62.     Costas Meghir first made an inquiry while I was at Apple, but had not gone into contract on any property and did not submit a purchase.  Subsequently, he reached out to me at GuardHill and I was able to help him get a loan at Chase, which no longer did business with Apple.  His application was taken on March 6, 2014, after Apple had stopped taking new loan applications.

63.     Michael Myers was never an Apple client.  He was referred to me at GuardHill.  I was able to help him get a loan at Chase by a former client of mine, which no longer did business with Apple.

64.     Susan Schuman worked with me on multiple mortgages at Apple and wanted to continue working with me at GuardHill.  I was able to help her get a loan at EverBank, again a bank that no longer did business with Apple.  That application was taken on March 11, 2014, after Apple had stopped taking new loan applications.

12

65.   Robert Shamis first made an inquiry while I was at Apple, but he had not identified any property and did not submit a purchase.  Subsequently, he reached out to me at GuardHill and I was able to help him get a loan at CitiMortgage, which no longer did business with Apple.

66.   I think that Apple's demand to be paid with respect to these clients is completely without merit.  None of these clients were procured through illicit means and I did not use any information taken from Apple in connection with their loans.

_____
Richard Barenblatt

Sworn to before me this
16th day of June, 2015

_____
Notary Public

JOAN F RUSSO
Notary Public State of New York
No. 01RU5056074
Qualified in Queens County
Commission Expires Jan. 29, 2018

13

2225569_1