```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
APPLE MORTGAGE CORP.,                        :
                                             :    Civil Action No. 13 CV 9233 (JGK)
                    Plaintiff,               :
                                             :
    -against-                                :    AFFIDAVIT OF KEITH FURER
                                             :    IN SUPPORT OF DEFENDANTS'
RICHARD BARENBLATT, KEITH FURER,             :    MOTION FOR SUMMARY
DAVID BREITSTEIN and KEVIN UNGAR,            :    JUDGMENT
                                             :
                    Defendants.              :
                                             :
------------------------------------------------------------x

STATE OF NEW YORK     )
                      )   ss.:
COUNTY OF NEW YORK    )
```

KEITH FURER, being duly sworn, deposes and says:

1. I am a Defendant on this action and I make this affidavit in support of our motion for summary judgment. I am over 18 years of age, and this affidavit is based upon my personal knowledge, except for matters set forth upon my information and belief, which is so stated where applicable.

**My Employment With Apple
and the Compensation Agreement**

2. I was employed by Plaintiff Apple Mortgage Corp. ("Apple") from November 1998 until I resigned on September 3, 2013.

3. I was an "at-will" employee, and was not bound by any restrictive covenant, noncompete or nonsolicit provision limiting my post-employment activities. I was never required to sign a confidentiality or non-disclosure agreement.

4. I was compensated by Apple solely on a commission basis, and Apple did not pay any health benefits.

1

5.  I was entitled to commissions on loans originated by me, and I was paid after the loans closed and Apple received its fee.

6.  The terms of my compensation was set forth in a Compensation Agreements drafted and executed by Apple, which is attached hereto as Exhibit 1.

7.  The Compensation Agreement begins with the following declaration: "Henceforth, **this agreement will be the sole agreement regarding compensation** between Apple Mortgage Corp. and [the Defendant] (hereinafter "LO"). Apple Mortgage Corp. agrees to compensate the LO based on the following terms." (Emphasis added.)

8.  The Compensation Agreement provides the formula for commissions as follows:

> Your Compensation will be based on 56% of the loan amount and **cannot vary from one transaction to another**. First $250 will be reduced from 1% of the loan amount. Then your compensation will be 56% of the remainder.
> (Emphasis added.)

The Compensation Agreement does not state that I had to be employed at the time the loan closed to be compensated, or that I had to be involved in the closing.

9.  The Compensation Agreement further provided for bonuses to be paid if certain achievements were met, such as originating more loans than in the same quarter the prior year, having applicants who have communicated their satisfaction to Apple, originating loans through new referral sources, and closing a large percentage of the loans submitted.

10. In practice, although the amounts were discretionary under the Compensation Agreement, Apple agreed orally to pay such amounts in regular quarterly intervals and did so at all times prior to my departure.

11. As noted in the Compensation Agreement, there were no other agreements regarding compensation between Apple and me. The Compensation Agreement memorialized the terms of the agreement between that had been in place prior to that.

12. In or about 2003, I was provided with an Employee Handbook (the "Handbook") and asked to sign an "Employee Acknowledgement Form" verifying receipt, copies of which are attached hereto as Exhibit 2. I understood that the Handbook was drafted by Mr. Appelbaum. I did not have any input,.

13. The Handbook did not deal at all with my compensation. I did not understand it to be a contract between me and Apple as it stated, among other things:

> The policies in this handbook are not intended to create a contract. The policies should not be construed to constitute contractual obligations of any kind or a contract of employment between [Apple] and any employee.
> (Handbook at Section 101: Nature of Employment.)
>
> I understand and acknowledge that this handbook is not a contract of employment or a legal document.
> (Employee Acknowledgement Form.)

14. Accordingly, there are no contracts concerning the compensation owed to Defendants except for the Compensation Agreements.

**The Additional Charges to My Commissions**

15. The commissions paid to me in fact varied from the calculations set forth in the Compensation Agreement. In addition to the formula I agreed to in that document, I was subjected to charges or downward adjustments that decreased the amount I was ultimately paid.

16. Contrary to the Compensation Agreement, Apple reduce my percentage by ten basis points – from 56% to 46% for – for any loans where the leads were supposedly given to me by Apple.

17. I was also charged for certain advertising costs and was assessed a portion of the salary of Doug Morgan, a fellow Apple employee, despite the lack of any written agreement providing for such.

18. In addition to these deductions or adjustments, during the time period from 2001 to 2004, my compensation was reduced by $276 in each pay period from the gross commission as calculated pursuant to the Compensation Agreements. The deductions were referred to with the description "FICA."

19. The $276 was not the share of FICA that I paid out of my earnings. That portion was deducted separately by the outside payroll company that issued paychecks for Apple. The $276 was taken out before the payroll company deducted any taxes.

20. The $276 charge was imposed years ago by Apple, and we were told that its purpose was to cover the employer's FICA contribution.

21. I learned towards the end of my employment at Apple that some loan originators were not charged the $276 fee and for others it was discontinued at various times. Mr. Appelbaum stopped charging me sometime in or about 2004, but told me at the time not to tell anyone else.

22. Prior to that, I was never asked or given any choice, and I never agreed to have an additional $276 taken out of each paycheck. Instead, the charge was imposed by Appelbaum. In the course of leaving Apple and talking to the other Defendants, we learned for the first time that not every employee paid the FICA deduction, and that it had been suspended for different Apple employees at different times.

23. The charges for leads, advertising, employee salary and "FICA" were set forth on commission worksheets that Apple required to be submitted before it would pay any

4

commissions. The charge for leads was applied to determine the "gross commission" amount, and the other charges were applied to determine a net commission.

24. The $276 charge was taken from every paycheck to me from some time in 2001 until around 2004, and I estimate that the total taken was about $28,704.00. We asked Apple to produce records of the charges in this litigation, but they did not produce documents sufficient for us to calculate the totals.

25. I understand that Apple is asserting that, as a legal matter, my commissions were not "earned" until the charges for FICA were applied. I do not know when, as a legal matter, my commissions were "earned." I do not recall any discussion at Apple or any documents indicating when commissions were earned.

26. But what I believed at the time, what I believe today, and what I will testify to at trial is the following. I was a loan officer compensated by commission only, and I was entitled to my commission if and when I matched a willing borrower with a willing lender. Apple did not give me my commission check until the loan closed and Apple got paid its fee, but I earned the commission when I brought together the borrower and the lender. I was paid to originate loans, not to close them. We had a processing staff to do the administrative work.

27. The charges for leads, advertising, employee salary and FICA were required by Mr. Appelbaum. I could not get paid by him unless those items were included on the commission statement.

28. I did not learn at the time that these charges were imposed at the whim of Mr. Appelbaum, for reasons he never shared with us. They were not part of the calculation of our commissions. They were adjustments imposed after the fact. He took this money from me

5

and my family and was not straightforward or honest about it. I cannot believe that he has the nerve now to accuse me of being disloyal.

## My Departure From Apple

29. On September 3, 2013, I resigned my employment with Apple, and commenced employment with GuardHill Financial Corporation ("GuardHill").

30. I resigned to better grow my business, which had become stagnant because Apple continued to be a mere mortgage broker. Companies like GuardHill, which is both a mortgage broker and a mortgage banker licensed by the State of New York and a number of other states, offer more products to their clients and I concluded a move would significantly enhance my business to work there.

31. In fact, many major banks who previously did business with Apple had ceased to do so, including Chase, CitiMortgage and Wells Fargo, some of the key lenders in New York City, and Apple had grown increasingly uncompetitive.

32. Many of us had raised concerns about this and Mr. Appelbaum told us time and again that Apple was going to get a banking license with the New York State Department of Banking. But it never happened and I could not wait any longer.

33. It was not easy to leave Apple. I had been there for 15 years and it was in many ways my home. I thought I had been a big part of helping Mr. Appelbaum grow the business. But we had stopped growing and, ultimately, I needed to do what was right for my business and my family.

## My Unpaid Commissions

34. When I left Apple, I was owed commissions and bonuses on loans that had closed, and I had originated some other loans that would be closing soon. After I left, I asked Apple to pay me the following amounts:

6

| Iwashiro | $7,034.25 |
|---|---|
| Kennedy | $3,729 |
| Zale | $3,502.66 |
| Uh | $4,459.97 |
| Smitherman | $1,834.13 |
| Calloni | $1,586.24 |
| Henry | $3,305.25 |
| Huldisch | $1,861.68 |
| Q. Tang | $4,435.25 |
| English | $1,518.43 |
| Du | $693.26 |
| Lee | $550.88 |
| Muller | $728.85 |
| Velez | $1,275.49 |
| Zhou | $347.26 |
| Commission Total: | $36,862.60 |
| Jimmy Mamakas Override | $5,967.90 |
| Unpaid Prior Comms. | $20,996 |
| **Furer Total** | **$63,826.50** |

35. I worked hard, diligently and loyally in procuring each of these loans, and I deserved to be paid for them. I know that Mr. Appelbaum is offended that we all left, and he may honestly believe we did something wrong at the time, even if I disagree with that. But I see no reason why he should be entitled to withhold commissions and bonuses from me. Despite what I believe, Apple has not paid me for any of them.

36. Instead, Apple sued me.

**My Preparations in Departing Apple**

37. Apple was the first job I ever had as a loan originator and in 15 years I had never changed employment, despite having opportunities to do so. When I finally decided to leave, I made every effort to do it properly, without causing harm to Apple and without doing anything inappropriate.

38. I do not believe I did anything that justified Apple withholding the commissions it owed me or filing a federal law suit.

7

### Outlook Contact Lists

39.     Over the years while I was employed by Apple, I maintained an Outlook contact database, which included personal contacts, business-related contacts such as colleagues and potential referral sources, and past clients who had worked on loans with me. This database was maintained by me – nobody else at Apple did any work on it. I was not paid to keep a contact list or update my Outlook contacts, nor did anyone ever tell me that the contents belonged to Apple. They are my contacts, so I do not understand how Apple could own them.

40.     My Outlook contacts had contained names, addresses, telephone numbers and email addresses. It did not include social security numbers, account numbers, lists of assets, credit ratings, customer preferences, or information regarding prior mortgages or other financial transactions.

41.     Each loan originator at Apple – and there were as many as 20 loan originators at a time – maintained his own Outlook contact database. The databases were not comingled or shared.

42.     During my employment with Apple, I provided my Outlook contacts to Geoff Sheerar, a former Apple employee who has his own sales consulting business, who I had engaged to assist me in marketing. Mr. Appelbaum was well aware that Mr. Sheerar was helping me with marketing and had access to the contacts I maintained, but he never voiced any objection. Nor did he ever pay any share of the cost of this assistance.

43.     Accordingly, Mr. Sheerar already had the vast bulk of my contacts well before I left Apple. I sent him some current lists just to make sure we had everything, but I suspect it did not add very much. In any event, we could have reproduced most of my Outlook contact database from scratch. Most of my referral sources are real estate attorneys and real estate brokers, who are easily found on the internet. I could find the past clients because I know

2225373_1

their names and addresses (having helped them get mortgages). Others in my Outlook contacts were family and friends who I could easily find. And many of the contacts are connected to me on LinkedIn.

44. There were no policies or procedures at Apple specifically regarding the maintenance of Outlook contact databases. I was never asked to sign a non-disclosure agreement.

45. Other employees had left Apple in the past and I know they took their Outlook contacts with them. I never heard Mr. Appelbaum complain about that until the other Defendants and I left.

46. I believe that any new employer in the industry would have expected me to bring my contacts. In fact, it was a term of my employment agreement with GuardHill to notify my contacts of my new job.

47. Thus, I believed – and I still believe – that I had every right to take a copy of my Outlook contact list when I left Apple.

### Other Information and Documents

48. In the course of gathering my effects in preparation to leave Apple, I took some copies of summary sheets printed off the Encompass database at Apple – which contained loan files for deals we had done. My intent was to make sure that I had everyone's email address and birth date, so we could send out birthday greetings in the course of marketing. After I began at GuardHill, I entered some of the email addresses and birth dates into my contacts – and I had an intern assist me in that process – and then I had the documents shredded. I did not keep, copy or reveal any social security numbers or any financial information on those sheets.

9

49. Aside from my Outlook contacts, some summary sheets that contained some of those contacts organized in various groups, and the Encompass summary sheets discussed above, I did not take anything from Apple's files or systems.

50. I did not delete anything from the Encompass database. I may have deleted some items in the course of cleaning up my files and getting ready to leave, but none of that was meant to deprive Apple of information or causing harm to its business.

51. Other than the Outlook contact lists, I have not utilized any business information taken from Apple since my departure, nor have I provided such information to any other person. And all such information in my possession, custody or control has been provided to Apple in the course of this litigation.

52. At Apple, I was required to buy my own cell phone, which I took with me when I left. For a few days thereafter, I continued to receive some emails at my Apple address. I did not access or attempt to access Apple's computer system at any time following my resignation.

53. When I started at GuardHill, I had my contacts put on the system and we sent an email blast telling everyone that I had a new job. The blast I sent is attached hereto as Exhibit 3.

54. Other than my Outlook contacts, I have not utilized any information from Apple, or provided any Apple information to anyone else. I have not used any personal information of Apple clients, such as social security numbers, credit ratings, asset and salary information, or even birthdates, that I acquired while I was employed by Apple.

**My Loan Originations at GuardHill**

55. I understand that the damages sought by Apple in this case are in part based on three of the loans that I have originated at GuardHill since joining.

10

56. Joshua Bell was never an Apple client. The loan application was taken on April 25, 2014, after Apple had stopped taking applications, and the loan was secured from FNBLI, a bank that never did business with Apple.

57. Julie Grau was never an Apple client. The loan application was taken on March 27, 2014, after Apple had stopped taking applications, and the loan was secured from Chase, a bank that no longer did business with Apple.

58. Jeffrey Halley was never an Apple client. He was referred to me by a contact of mine at CitiMortgage.

59. Elie Hirschfeld was never an Apple client. The loan application was taken on September 11, 2014, after Apple had stopped taking applications, and the loan was secured from FNBLI, a bank that never did business with Apple.

60. Joanne Hsieh was declined for a loan at Apple and asked me to work on it at GuardHill. The loan was secured from FNBLI, again a bank that never did business with Apple.

61. Yuki Iwashiro was referred to me by her mother, who works with a New York City realtor and is a key referral source of mine.

62. Andrew Kahn was never an Apple client. He was introduced to me by a realtor and his loan application was taken on April 5, 2014, after Apple had stopped taking applications. The loan was secured from FNBLI, a bank that never did business with Apple.

63. Eric Larson was not able to get a loan at Apple and was referred to me by an Apple employee. I was able to help him get a loan from CitiMortgage, yet another bank that no longer did business with Apple.

11

64. Rochelle Leonardo was never an Apple client. The loan application was taken on April 3, 2014, after Apple had stopped taking applications, and the loan was secured from Chase, a bank that no longer did business with Apple.

65. Corey Nguyen was never an Apple client. The loan application was taken on February 13, 2014, after Apple had stopped taking applications, and the loan was secured from Chase, a bank that no longer did business with Apple.

66. Dan Schleckser and Andrew Jenkins were borrowers who had worked with me at Apple and sought me out at GuardHill about refinancing a beach house. The loan application was taken on April 24, 2014, after Apple had stopped taking applications, and the loan was secured from FNBLI, a bank that never did business with Apple.

67. Joanne Seorti was never an Apple client. At GuardHill, I was able to help him get a loan from Chase, a bank that no longer did business with Apple.

68. Rosalind Solomon had spoken to me while I was still at Apple, but did not become a client or complete a loan. She was connected to me at GuardHill through another client. The loan application was taken on August 21, 2014, after Apple had stopped taking applications, and the loan was secured from Bank of Internet, a bank that no longer did business with Apple.

2225373_1

69. I see no basis for Apple receiving any portion of the commission on these loans. None of these clients were procured through illicit means and I did not use any information taken from Apple in connection with their loans.

_____
Keith Furer

Sworn to before me this
___ day of June, 2015

_____
Notary Public

**Shota Milorava**
**Notary Public, State of New York**
No. 01MI6127946
Qualified in Kings County
Commission Expires May 31, 2017

2225373_1