UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
APPLE MORTGAGE CORP.,

       Plaintiff,

 -against-

RICHARD BARENBLATT, KEITH FURER,
DAVID BREITSTEIN and KEVIN UNGAR,

       Defendants.

------------------------------------------------------------------ x

Civil Action No. 13 CV 9233 (JGK)

**AFFIDAVIT OF KEVIN UNGAR IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK )
         ) ss.:
COUNTY OF NEW YORK )

  KEVIN UNGAR, being duly sworn, deposes and says:

  1. I am a Defendant in this action and I make this affidavit in support of our motion for summary judgment. I am over 18 years of age, and this affidavit is based upon my personal knowledge, except for matters set forth upon my information and belief, which is so stated where applicable.

### My Employment With Apple and the Compensation Agreement

  2. I was employed by Plaintiff Apple Mortgage Corp. ("Apple") from 2001 until I resigned on September 3, 2013. Apple's President and my direct supervisor was Eric Appelbaum.

  3. At Apple, I understood that I was an "at-will" employee, and was not bound by any restrictive covenant, noncompete or nonsolicit provision limiting my post-employment activities. I was never required to sign a confidentiality or non-disclosure agreement.

1

4. I was compensated by Apple solely on a commission basis, and Apple did not pay any health benefits.

5. I was entitled to commissions on loans originated by me, and I was paid after the loans closed and Apple received its fee.

6. The terms of my compensation was set forth in a Compensation Agreement drafted and executed by Apple, which is attached hereto as Exhibit 1. The Compensation Agreement was drafted by Mr. Appelbaum without any input from me or the other loan originators working at Apple.

7. The Compensation Agreement begins with the following declaration: "Henceforth, **this agreement will be the sole agreement regarding compensation** between Apple Mortgage Corp. and [the Defendant] (hereinafter "LO"). Apple Mortgage Corp. agrees to compensate the LO based on the following terms." (Emphasis added.)

8. The Compensation Agreement provides the formula for commissions as follows:

> Your Compensation will be based on 50% of the loan amount and **cannot vary from one transaction to another**. First $400 will be reduced from 1% of the loan amount. Then your compensation will be 50% of the remainder.
> (Emphasis added.)

The Compensation Agreement does not state that I had to be employed at the time the loan closed to be compensated, or that I had to be involved in the closing.

9. The Compensation Agreement further provided for bonuses to be paid if certain achievements were met, such as originating more loans than in the same quarter the prior year, having applicants who have communicated their satisfaction to Apple, originating loans through new referral sources, and closing a large percentage of the loans submitted.

2

10.     In practice, although the amounts were discretionary under the Compensation Agreement, Apple agreed orally to pay such amounts in regular quarterly intervals and did so at all times prior to my departure.

11.     As noted in the Compensation Agreement, there were no other agreements regarding compensation between Apple and me.  The Compensation Agreement documented the terms of the agreement between that had been in place prior to that.

12.     In or about 2003, I was provided with an Employee Handbook (the "Handbook") and asked to sign an "Employee Acknowledgement Form" verifying receipt, copies of which are attached hereto as Exhibit 2.  I understood that the Handbook was drafted by Mr. Appelbaum.  I did not have any input,.

13.     The Handbook did not deal at all with my compensation.  I did not understand it to be a contract between me and Apple as it stated, among other things:

> The policies in this handbook are not intended to create a contract.  The policies should not be construed to constitute contractual obligations of any kind or a contract of employment between [Apple] and any employee.
> (Handbook at Section 101: Nature of Employment.)
>
> I understand and acknowledge that this handbook is not a contract of employment or a legal document.
> (Employee Acknowledgement Form.)

14.     Accordingly, there are no contracts concerning the compensation owed to me except for the Compensation Agreement.

### The Additional Charges to My Commissions

15.     The commissions paid to me in fact varied from the calculations set forth in the Compensation Agreement.  In addition to the formula I agreed to in that document, I was subjected to charges or downward adjustments that decreased the amount I was ultimately paid.

16. Contrary to the Compensation Agreement, Apple reduce my percentage by ten basis points – from 50% to 40% for – for any loans where the leads were supposedly given to me by Apple.

17. At times I was also charged for advertising costs, despite the lack of any written agreement providing for such.

18. In addition to these adjustments, from the beginning of my employment until approximately July 2012, Apple imposed a $276 charge in each pay period. This charge was assessed after the amounts were calculated pursuant to the Compensation Agreement, and it was referred to by Apple with the description "FICA."

19. The $276 was not the share of FICA that I paid out of my earnings. That portion was deducted separately by the outside payroll company that issued paychecks for Apple. The $276 was taken out before the payroll company deducted any taxes.

20. The $276 charge was imposed years ago by Apple, and we were told that its purpose was to cover the employer's FICA contribution.

21. I learned towards the end of my employment at Apple that some loan originators were not charged the $276 fee and for others it was discontinued at various times. In or about July 2012, Mr. Appelbaum called me up out of the blue and said he would stop charging me the $276. He told me at the time not to tell anyone.

22. Prior to that, I was never asked or given any choice, and I never agreed to have an additional $276 taken out of each paycheck. Instead, the charge was imposed by Appelbaum. In the course of leaving Apple and talking to the other Defendants, we learned for the first time that not every employee paid the FICA deduction, and that it had been suspended for different Apple employees at different times.

23. The charges for leads, advertising and "FICA" were set forth on commission worksheets that Apple required to be submitted before it would pay any commissions. The charge for leads would be applied to determine the "gross commission" amount and the other charges would be applied to determine a net commission.

24. The $276 charge was taken from every paycheck to me from some time in 2001 until I left in 2013. Because I did not generate commissions in every pay period, I did not receive a paycheck every two weeks. Typically, when there was a pay period missed, Apple would double the $276 charge in the next pay period. Accordingly, I believe that the total amount of the "FICA" charges taken from me is as much as $78,936.00. We asked Apple to produce records of the charges in this litigation, but they did not produce documents sufficient for us to calculate the totals.

25. I understand that Apple is asserting that, as a legal matter, my commissions were not "earned" until the charges for FICA were applied. At my deposition counsel used the word "earned" in some lengthy questions he asked, but I do not know when, as a legal matter, my commissions were "earned" and I certainly did not mean to testify to that effect. I do not recall any discussion at Apple or any documents indicating when commissions were earned.

26. But what I believed at the time, what I believe today, and what I will testify to at trial is the following. I was a loan officer compensated by commission only, and I was entitled to my commission if and when I matched a willing borrower with a willing lender. As a practical matter, I did not get paid until the loan closed and Apple got paid its fee, but I earned the commission when I brought together the borrower and the lender. I was paid to

originate loans, not to close them, and we had processors on staff who dealt with making sure the loans closed.

27.     The other charges – for leads provided, advertising and FICA – were extra fees mandated by Mr. Appelbaum. I could not get paid by him unless those items were included on the commission statement. That was not a matter of negotiation; it was a requirement of Mr. Appelbaum.

28.     I did not learn at the time that these charges were imposed at the whim of Mr. Appelbaum, on a basis only he knows. Because the charges were imposed by him capriciously, I strongly disagree with any argument that they were part of the calculation of our commissions. They were adjustments imposed after the fact. He took this money from us for years, unfairly and without revealing the truth. He took money from me and my family, and I am absolutely amazed that he had the gall now to assert that we were the disloyal ones.

**My Departure From Apple**

29.     On September 3, 2013, I resigned my employment with Apple, and commenced employment with GuardHill Financial Corporation ("GuardHill").

30.     I left Apple to increase my business prospects. I believed they would improve if I moved from a mortgage broker only platform to a company that is both a mortgage broker and a mortgage banker. I was hopeful that I would be able to offer more products to my clients and enhance my business. I understand that Mr. Appelbaum had the same notion, as he sold his business shortly after I left and moved to Sterling National Bank, where he too could offer solutions as both a mortgage broker and a mortgage banker.

31.     Prior to my departure, a number of the banks who previously did business with Apple had stopped doing so, including financial institutions like Chase, CitiMortgage and

Wells Fargo, which are key lenders in the New York City real estate market. As a result, Apple had grown increasingly uncompetitive and my livelihood was being jeopardized.

32. Many of us had raised concerns about this and Mr. Appelbaum told us time and again that Apple was going to get a banking license with the New York State Department of Banking. But it never happened and I could not wait any longer.

33. I was conflicted leaving Apple. I had been there for over a decade, had always enjoyed the people and felt like a part of the company. But I needed to think about my ability to provide for my family, and I concluded that GuardHill would help me expand my business.

**The Unpaid Commissions**

34. When I left Apple, I was owed commissions and bonuses on loans that had closed, and I had originated some other loans that would be closing soon. After I left, I asked Apple to pay me the following amounts:

| Russo | $3,287 |
| Sirken | $2,696 |
| Naple | $3,169 |
| Valentino | $1,981 |
| Singh | $913 |
| Hort | $3,750 |
| Leung | $825 |
| Commission Total: | $16,621 |
| Unpaid Prior Comms. | $10,000 |
| **Ungar Total** | **$26,621** |

35. I know that Mr. Appelbaum was upset when we left, and I can even appreciate that he may have complaints about the manner in which we departed, although I believe they are ultimately without merit, as discussed below. But in any event there has been no suggestion that I was disloyal in the course of producing the loans that generated these

commissions and bonuses, and I believe I am entitled to receive the commissions and bonuses I am owed. Nonetheless, Apple has not paid me for any of them.

36. Instead, Apple sued me.

**The Alleged Taking and Deleting of Information by Defendants**

37. Apple was the first job I had in the mortgage origination industry and I was there for 12 years. I was not experienced in leaving one company for another, but I did my very best to do it properly, without causing harm to Apple and without doing anything inappropriate.

38. In any event, I do not believe I did anything that justified Apple withholding the commissions it owed me or filing a federal law suit.

### Outlook Contact Lists

39. Over the years while I was employed by Apple, I maintained an Outlook contact database, which included personal contacts, business-related contacts such as colleagues and potential referral sources, and past clients who had worked on loans with me. This database was maintained by me alone – nobody else at Apple did any work on it. I was not paid to keep a contact list or update my Outlook contacts, nor did anyone ever tell me that the contents belonged to Apple. They are my contacts, so I do not understand how Apple could own them.

40. My Outlook contacts had contained names, addresses, telephone numbers and email addresses. It did not include social security numbers, account numbers, lists of assets, credit ratings, customer preferences, or information regarding prior mortgages or other financial transactions.

41. Each loan originator at Apple – and there were as many as 20 loan originators at a time – maintained his own Outlook contact database. The databases were not comingled or shared.

42. If I had to, I could have reproduced most of my Outlook contact database from scratch. Most of my referral sources are real estate attorneys and real estate brokers, who are easily found on the internet. I could find the past clients because I know their names and addresses (having helped them get mortgages). Others in my Outlook contacts were family and friends who I could easily find. And many of the contacts are connected to me on LinkedIn.

43. There were no policies or procedures at Apple specifically regarding the maintenance of Outlook contact databases. I was never asked to sign a non-disclosure agreement.

44. Other employees had left Apple in the past and I know they took their Outlook contacts with them. I never heard Mr. Appelbaum complain about that until the other Defendants and I left.

45. I believe that any new employer in the industry would have expected me to bring my contacts. In fact, it was a term of our employment agreement with GuardHill to notify my contacts of my new job.

46. Thus, I believed – and I still believe – that I had every right to take a copy of my Outlook contact list when I left Apple.

### Other Information and Documents

47. Prior to leaving Apple, I did not copy any materials to external hard drives. I did send a few things to my wife's email account, as I did not have a personal email account in regular use, but those items were limited to portions of my Outlook database and lists of deals I had not yet been paid on. All of this information has been produced to Apple in this lawsuit.

48. In addition to that, I took some summary sheets that we printed from the Encompass database at Apple, which contained information on mortgages completed at Apple. I

9

2225568_1

only took sheets relating to my own clients and I only did so with the thought that I would check them for any missing email addresses, or to use the birthdates by sending birthday cards to keep in touch. But I did not do any of that. Ultimately, I held on to the sheets for a week or so and then discarded them, without ever using any of the information or showing them to anyone.

49. I did not delete anything from the Encompass database. I may have deleted some items in the course of cleaning up my files and getting ready to leave, but none of that was meant to deprive Apple of information or causing harm to its business.

50. Other than the Outlook contact lists, I have not utilized any business information taken from Apple since my departure, nor have I provided such information to any other person. And all such information in my possession, custody or control has been provided to Apple in the course of this litigation.

51. At Apple, I was required to buy my own cell phone, which I took with me when I left. For a few days thereafter, I continued to receive some emails at my Apple address. I did not access or attempt to access Apple's computer system at any time following my resignation.

52. When I started at GuardHill, I had my contacts put on the system and we sent an email blast telling everyone that I had a new job. The blast I sent is attached hereto as Exhibit 3.

53. Other than my Outlook contacts, I have not utilized any information from Apple, or provided any Apple information to anyone else. I have not used any personal information of Apple clients, such as social security numbers, credit ratings, asset and salary information, or even birthdates, that I acquired while I was employed by Apple.

2225568_1

### My Loan Originations at GuardHill

54.     I understand that the damages sought by Apple in this case are in part based on three of the loans that I have originated at GuardHill since joining.

55.     Bryan Burkhart tried to refinance at Apple, but was unable to get a loan closed. He reached out to me at Apple, and I was able to help him get a loan at Chase, a bank which no longer did business with Apple.

56.     Helen Chan was never an Apple client. Her application was taken on March 13, 2014, after Apple had stopped taking applications, and she got a loan from CitiMortgage, another bank that no longer did business with Apple.

57.     Jonathan Cullum had been a client of mine at Apple and I believe we worked on two loans together. On or about September 12th (about two weeks after I started at GuardHill), Mr. Cullum located me by searching on Google and calling the main GuardHill number. He told me that he had called my Apple number, and that his call had been returned by Mr. Appelbaum, who had offered to help him his refinancing. After speaking with both Mr. Appelbaum and me, Mr. Cullum chose to work with me on a refinancing, and he got a loan from Chase, again a bank which no longer did business with Apple.

58.     Later, Mr. Cullum reported to me that he had called Mr. Appelbaum back, as a courtesy, to let him know that Mr. Cullum had decided to work with me. According to Mr. Cullum, Mr. Appelaum's demeanor and attitude changed immediately, Mr. Appelbaum called me a liar and a thief and said I wasn't trustworthy. Mr. Cullum told me that Mr. Appelbaum's reaction was the most unprofessional behavior he has ever encountered.

59.     I share these details to highlight the flaws in Apple's argument that it is somehow entitled to monetary damages on these transactions. This was my client relationship to begin with. He found me again using Google. He gave Mr. Appelbaum a chance to compete,

11

but Mr. Appelbaum could not secure the business, nor could he have originated a loan at Chase. Mr. Appelbaum's stubborn insistence that he nonetheless should be paid the commission for Mr. Cullum's loan, in the face of these facts, is utterly mystifying.

60. Andrew Liebhaber was never an Apple client. I worked with his brother Michael at Apple, who referred Andrew to me after I joined GuardHill. Andrew ultimately did two loan transactions at GuardHill. The applications were taken on February 14 and 20, 2014, both after Apple had stopped taking applications, and the loans were with Chase, again a bank that no longer did business with Apple.

61. Finally, Amy Thompson is a client that I met at Apple, where she was referred to me by Mr. Appelbaum. She did not submit an application to apple or obtain a loan there. When I moved to GuardHill, I told her she could continue working with me or could stay with Apple, and she chose to work with me. She ultimately obtained a loan with CitiMortgage, which she could not have done at Apple.

62. I think it is absurd that Apple believes it is entitled to share in any of these commissions. None of these clients were procured through illicit means and I did not use any information taken from Apple in connection with their loans.

_____
Kevin Ungar

Sworn to before me this
19th day of June, 2015

_____
Notary Public

JOAN F. RUSSO
Notary Public State of New York
No. 01RU5056074
Qualified in Queens County
Commission Expires Jan. 29, 2018

12

2225568_1