**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

**APPLE MORTGAGE CORP.,**

                    **Plaintiff,**

         **- against -**

**RICHARD BARENBLATT ET AL.,**

                    **Defendants.**

─────────────────────────────────

**13-cv-9233**

<u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

    Apple Mortgage ("Apple"), a mortgage broker in New York, brought this action against four former employees of Apple, namely Richard Barenblatt, David Breitstein, Keith Furer, and Kevin Ungar (collectively the "defendants"), after those employees resigned from Apple and joined GuardHill Financial Corporation ("GuardHill"), another mortgage broker. The gist of Apple's suit is that the defendants copied documents pertaining to Apple's customers and used the information at GuardHill to close deals with purported Apple customers.

    Apple asserted various state law claims against the defendants, including breach of contract, unfair competition, and tortious interference with prospective and existing contractual relations. Apple also brought claims against the defendants for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq. ("CFAA"), alleging that the defendants accessed Apple's computer network without authorization. Compl.

1

¶¶ 126-27, 131-34. Apple sought injunctive relief and at least $5 million in compensatory damages and $10 million in punitive damages. The defendants brought several counterclaims against Apple, arguing that Apple had failed to pay them commissions for loans including loans that closed after they left Apple and quarterly bonuses to which they were allegedly entitled. The defendants also claimed that Apple improperly deducted $276 from each of their paychecks and other amounts for various expenses such as advertising, although these deductions were not part of the compensation formula in the defendants' employment contracts. Defs.' Answer ¶¶ 3, 104-07, 130, 134, 139, 144, 155-56, 159.

This Court has jurisdiction under 28 U.S.C. § 1331 over Apple's claims under the CFAA. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Apple's state law claims under New York law and the defendants' state law counterclaims.

Apple now moves for summary judgment dismissing the defendants' counterclaims. The defendants move for summary judgment dismissing Apple's claims and cross move for summary judgment on Apple's liability on their counterclaims. The defendants' motion for summary judgment dismissing Apple's claims is granted, and the defendants' cross-motion for summary judgment as to Apple's liability on the counterclaims is denied.

Apple's motion for summary judgment dismissing the defendants' counterclaims is granted in part and denied in part.

## I.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify the material facts and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)); <u>see also</u> <u>Gallo</u>, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. <u>See</u> <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994).

## II.

The parties do not dispute the following facts unless otherwise noted.

Defendants David Breitstein, Keith Furer, Richard Barenblatt, and Kevin Ungar began working as mortgage loan originators at Apple between November 1998 and November 2002. Pl.'s 56.1 Stmt. ¶¶ 1-4; Defs.' 56.1 Resp. ¶¶ 1-4. The defendants were at will employees. Defs.' 56.1 Stmt. ¶ 5; Pl.'s 56.1 Resp. ¶ 5. Eric Appelbaum is the sole owner of Apple and was the President of Apple while the defendants were employed by Apple. Defs.' 56.1 Stmt. ¶ 3; Pl.'s 56.1 Resp. ¶ 3.

During their employment, the defendants received an Employee Handbook. Pl.'s 56.1 Stmt. ¶¶ 5-8; Defs.' 56.1 Resp. ¶¶ 5-8. The Handbook stated that it was "not a contract of employment or a legal document" and that it was the employee's "responsibility to read and follow the policies." Rogin Decl., Ex. I, at 7. Each defendant signed an employee acknowledgment form. Rogin Decl., Exs. J-M. There is no dispute that the Handbook included a "Non-Disclosure" provision that explained that if employees had access to confidential information such as financial information and marketing strategies, Apple "may ask that [the employee] sign a non-disclosure agreement as a condition of [the employee's] employment." Rogin Decl., Ex. I, at 14 (§ 112). None of the defendants were ever required to sign a confidentiality or non-disclosure agreement. Defs.' 56.1 Stmt. ¶ 5; Pl.'s 56.1 Stmt. ¶ 5. The Handbook also stated that Apple prohibited "[s]ending or posting confidential material, trade secrets, or proprietary information outside of the organization." Rogin Decl., Ex. I, at 34 (§ 517).[1]

Each defendant also signed a Compensation Agreement that set forth a compensation formula based on the loans originated by the defendants. Pl.'s 56.1 Stmt. ¶¶ 13-16; Defs.' 56.1 Resp. ¶¶ 13-16. The Compensation Agreements are almost identical—the only

---

[1] The parties dispute the effect of the Handbook but the content of the Handbook is undisputed. Pl.'s 56.1 Stmt. ¶ 9; Defs.' 56.1 Resp. ¶ 9.

variation among the agreements is the percentage of the
commission. For example, Breitstein's compensation was based on
50% of the loan amount after $400 was reduced from 1% of the
loan amount. Rogin Decl., Ex. N. Furer's compensation by
contrast, was based on 56% of the loan amount after $250 was
reduced from 1% of the loan amount. Rogin Decl., Ex. O.
Barenblatt's compensation was based on 55% of the loan amount
after $400 was reduced from 1% of the loan amount. Rogin Decl.,
Ex. P. Ungar's compensation was based on 50% of the loan amount
after $400 was reduced from 1% of the loan amount. Rogin Decl.,
Ex. Q. The Compensation Agreements also provided that the
defendants "must comply with all Federal and State laws," and
that the defendants "shall not engage in any activities which
are deemed to be deceitful or misleading." Rogin Decl., Exs. N-
Q, §§ 1.3, 1.4.

Several deductions were taken from the defendants' paychecks,
including a 10% deduction for commissions for deals where Apple
provided the lead and advertising charges were assessed against
Furer, Breitstein, and Ungar. Defs.' 56.1 Stmt. ¶¶ 17-19. Apple
does not deny deducting these charges, but disputes the
frequency of some of those charges and contends that the
defendants agreed to those deductions. Pl.'s 56.1 Resp. ¶¶ 17-
19. The defendants dispute this characterization. Defs.' 56.1
Stmt. ¶ 29. A deduction of $276 was reflected in the defendants'

compensation for various pay periods and the adjustments were labeled as a "FICA" charge. Defs.' 56.1 Stmt. ¶ 20; Pl.'s 56.1 Resp. ¶ 20. This deduction had nothing to do with withholdings under Federal Insurance Contributions Act ("FICA"). Defs.' 56.1 Stmt. ¶ 21; Pl.'s 56.1 Resp. ¶ 21. The deductions were set forth on commission worksheets that the defendants submitted before Apple paid the commissions. Defs.' 56.1 Stmt. ¶ 31; Pl.'s 56.1 Resp. ¶ 31.

There is no dispute that on August 19, 2013, the defendants met with Alan Rosenbaum, the president of GuardHill, to discuss the possibility of becoming mortgage loan originators at GuardHill. Pl.'s 56.1 Stmt. ¶ 18; Defs.' 56.1 Resp. ¶ 18. The defendants signed employment agreements with GuardHill between August 30, 2013 and September 3, 2013. Pl.'s 56.1 Stmt. ¶¶ 19-22; Defs.' 56.1 Resp. ¶¶ 18-22. The defendants resigned from Apple and began working at GuardHill on September 3, 2013. Pl.'s 56.1 Stmt. ¶ 23; Defs.' 56.1 Resp. ¶ 23.

According to Apple, the defendants electronically copied information and documents during their final days at Apple. Pl.'s 56.1 Stmt. ¶ 26. The four defendants concede that they forwarded, emailed, or copied the contents of their Outlook contact lists. Pl.'s 56.1 Stmt. ¶¶ 30, 40, 50, 58; Defs.' 56.1 Resp. ¶¶ 30, 40, 50, 58. The defendants provided their Outlook contacts to GuardHill after joining GuardHill. Pl.'s 56.1 Stmt.

¶¶ 36, 49, 56, 63; Defs.' 56.1 Resp. ¶¶ 36, 49, 56, 63.[2]
Breitstein, Furer, and Unger also downloaded, emailed, or
printed documents from Apple's Encompass Database which
contained loan documents and customer information. They printed
out borrower summaries consisting of the first page of loan
applications. The loan documents, known as Forms 1003 and 1008,
contained customers' social security numbers and dates of birth.
Pl.'s 56.1 Stmt. ¶¶ 34, 43, 59; Defs.' 56.1 Resp. ¶¶ 34, 43, 59.[3]

    Breitstein and Barenblatt also uploaded documents from their
Apple computers to external memory devices. Pl.'s 56.1 Stmt. ¶¶
28, 51; Defs.' 56.1 Resp. ¶¶ 28, 51. It is undisputed that
Breitstein and Barenblatt connected the memory devices to
computers at GuardHill. Pl.'s 56.1 Stmt. ¶¶ 38, 54; Defs.' 56.1
Resp. ¶¶ 38, 54. The defendants deny however that Breitstein and
Barenblatt used the information on those external memory
devices. Pl.'s 56.1 Stmt. ¶¶ 38, 54; Defs.' 56.1 Resp. ¶¶ 38,
54.

    It is undisputed that Breitstein, Furer, and Barenblatt
deleted information and folders that were contained on their
computers at Apple and on their phones. Breitstein deleted all
the documents he copied onto his memory device from his computer

---

[2] The defendants contend that Apple did not have any role in creating their
Outlook databases. Defs.' 56.1 Resp. ¶¶ 36, 49, 50, 63.
[3] The defendants contend they did not use the information contained in these
documents at Guardhill. Defs.' 56.1 Resp. ¶¶ 43, 59.

at Apple. Pl.'s 56.1 Stmt. ¶ 29; Defs.' 56.1 Resp. ¶ 29.[4] On September 2, 2013, Furer remotely deleted folders on his phone which may have included client contact information. Pl.'s 56.1 Stmt. ¶ 47; Defs.' 56.1 Resp. ¶ 47. From August 27, 2013 to September 3, 2013, Barenblatt deleted files and folders from his computer at Apple. Pl.'s 56.1 Stmt. ¶ 57; Defs.' 56.1 Resp. ¶ 57.

It is undisputed that the defendants input their contact lists into their computers at GuardHill, and that an email was sent to their contacts announcing the defendants' new affiliation with GuardHill. Defs.' 56.1 Stmt. ¶ 81; Pl.'s 56.1 Resp. ¶ 81. The parties do not dispute that the defendants did not use the information they downloaded or printed from Apple's computers and databases. Specifically the defendants did not use any personal customer information such as social security numbers, salary information, or credit ratings. Defs.' 56.1 Stmt. ¶ 82; Pl.'s 56.1 Resp. ¶ 82. However, the defendants concede that Furer input some email addresses and birth dates from the loan documents into his computer at GuardHill. Pl.'s 56.1 Stmt. ¶ 46; Defs.' 56.1 Resp. ¶ 43.

---

[4] Breitstein contends that he thought the deletions were consistent with Apple policy and that Apple did not require electronic copies of client data to be retained. Defs.' 56.1 Resp. ¶ 29.

The parties dispute the extent of Apple's alleged losses and damages arising from the defendants' actions. See Defs.' 56.1 Stmt. ¶ 97; Pl.'s 56.1 Resp. ¶ 97. Apple initially sought damages for lost profits based on loans the defendants originated at GuardHill, the sign-on bonuses the defendants received from GuardHill, attorney's fees, and fees charged by Emanuel Mamakas for examining the server. Defs.' 56.1 Stmt. ¶ 105; Pl.'s 56.1 Resp. ¶ 105. Apple presently estimates its total damages at $139,733.92. Pl.'s 56.1 Resp. ¶ 106. Apple has also identified the cost of a technology consultant that it employed to recover files and determine what files were taken or deleted by the defendants. Pl.'s 56.1 Resp. ¶ 97.

The defendants' motion for summary judgment argues, in part, that Apple's claims should be dismissed because Apple ceased to exist as a corporate entity and sold its assets to Sterling National Bank ("Sterling"). In September 2013, after the defendants' resignation, Appelbaum initiated discussions with Sterling Bank regarding the possibility of selling Apple to Sterling. Defs.' 56.1 Stmt. ¶ 83; Pl.'s 56.1 Resp. ¶ 83. After this lawsuit commenced, Apple and Sterling signed a purchase agreement on February 4, 2014, pursuant to which Appelbaum had the right to receive Sterling stock valued at $250,000 and Apple would receive $50,000 in cash. Defs.' 56.1 Stmt. ¶ 86; Pl.'s 56.1 Resp. ¶ 86. The parties dispute whether Sterling acquired

all of Apple's assets, particularly whether Sterling purchased Apple's right to pursue this lawsuit. Defs.' 56.1 Stmt. ¶ 89; Pl.'s 56.1 Resp. ¶ 89. It is undisputed that Sterling was aware of the ongoing litigation between the defendants and Apple at the time that Apple and Sterling signed the purchase agreement. Defs.' 56.1 Stmt. ¶ 93; Pl.'s 56.1 Resp. ¶ 93. As of February 4, 2014, Apple ceased originating new loans and no longer has any active business or licenses necessary to conduct business as a mortgage broker. Defs.' 56.1 Stmt. ¶¶ 95-96; Pl.'s 56.1 Resp. ¶¶ 95-96.

The defendants brought several counterclaims. They seek commissions on loans that had already closed before they left Apple and loans that closed after they left Apple, in the amounts of (1) $9,463.12 (Breitstein); (2) $36,862.60 (Furer); (3) $64,366.42 (Barenblatt); and (4) $16,621 (Unger). Pl.'s 56.1 Stmt. ¶ 66; Defs.' 56.1 Resp. ¶ 66. The defendants also seek "unpaid prior commissions," arguing that they are owed bonuses: (1) $6,364.59(Breistein); (2) $26,963.90, including additional payment for mentoring another employee (Furer); (3) $12,000 (Barenblatt); (4) $10,000 (Ungar). Pl.'s 56.1 Stmt. ¶ 70; Defs.' 56.1 Resp. ¶¶ 66, 68, 70. The defendants also claim damages from improper deductions, but the amounts are disputed. Pl.'s 56.1 Stmt. ¶ 72; Defs.' 56.1 Resp. ¶ 72.

III.

A.

The defendants move for summary judgment dismissing all of Apple's claims. The gist of Apple's complaint is that the defendants misappropriated Apple's property by emailing Outlook contact lists, deleting certain files containing client contact information, and making copies of mortgage loan documents. Compl. ¶ 2. Apple alleges that after the defendants left their employment at Apple, they continued to access and delete information on Apple's computer network. Id.

Apple alleged eleven claims: (1) a cause of action for breach of the duty of loyalty against all the defendants for violating the terms of the Employee Manual by allegedly accessing and copying confidential client files, id. ¶¶ 82-86 ("Count 1"); (2) a cause of action for theft of business property against all the defendants for allegedly accessing and copying Apple's confidential files and deleting the information from Apple's network, id. ¶¶ 87-90 ("Count 2"); (3) a cause of action for unfair competition against all the defendants for allegedly copying Apple's files with the intent to use the information for the benefit of their new employer, id. ¶¶ 91-95 ("Count 3"); (4) a cause of action for breach of contract against all the defendants because the defendants allegedly had

an obligation not to misappropriate or disclose Apple's confidential information to third parties, id. ¶¶ 96-100 ("Count 4"); (5) a cause of action for conspiracy against all the defendants for allegedly conspiring amongst themselves and entering into a scheme to destroy Apple's business and goodwill, id. ¶¶ 101-06 ("Count 5"); (6) a cause of action for tortious interference with existing and prospective contractual relations against all the defendants for allegedly using data and documents from Apple's computer network and inducing Apple's clients to discontinue their business with Apple, id. ¶¶ 107-11 ("Count 6"); (7) a cause of action under the faithless servant doctrine against all the defendants for violating the fiduciary duty of loyalty the defendants owed to Apple by accessing and disclosing confidential client files and unfairly competing with Apple, id. ¶¶ 112-17 ("Count 7"); (8) three causes of action against all the defendants for violations of the CFAA, 18 U.S.C. §§ 1030(a)(2), (4), and (5), for allegedly accessing Apple's computer network without authorization and downloading confidential client information with intent to defraud, id. ¶¶ 118-23 ("Count 8"), furthering the intended fraud and obtaining value of more than $5,000.00 from Apple's confidential and proprietary information, id. ¶¶ 124-29 ("Count 9"), and disclosing the information from Apple's files to GuardHill, id. ¶¶ 130-34 ("Count 10"); and (9) a cause of action seeking a

constructive trust over any and all funds, commissions, and
revenue obtained as a result of the information the defendants
acquired from Apple's computer network, id. ¶¶ 135-37 ("Count
11").

The defendants now move for summary judgment dismissing all
of Apple's claims.

## 1.

The defendants move for summary judgment dismissing all of
Apple's claims on the ground that Apple does not have standing
to assert these claims because Apple is defunct and sold all of
its assets to Sterling. The defendants' argument that Apple is
defunct is without merit because Apple still exists as
corporation. Appelbaum Aff. in Opp. to Defs.' Mot. ¶ 3. Summary
judgment against Apple cannot be granted on that basis.

Apple responds to the defendants' argument that Apple sold
its assets to Sterling, by arguing that Sterling and Apple did
not intend to convey Apple's legal claims against the Defendants
as part of the asset sale. Id. ¶ 4. This argument fails in view
of the plain words of the contract.

"Under New York law, the initial interpretation of a
contract 'is a matter of law for the court to decide.'" K. Bell
& Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d
Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d
295, 299 (2d Cir. 1996)). "Included in this initial

14

interpretation is the threshold question of whether the terms of the contract are ambiguous." Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998); see also Curry Road Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990). A court should construe a contract as a matter of law only if the contract is unambiguous on its face. See Metro. Life Ins. Co. v. RJR Nabisco Inc., 906 F.2d 884, 889 (2d Cir. 1990). A contract is unambiguous if it "has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting Breed v. Insurance Co. of N. Am., 385 N.E.2d 1280 (1978)); see also Alexander & Alexander, 136 F.3d at 86; United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 109 (2d Cir. 1993); Metro. Life Ins. Co., 906 F.2d at 889.

If a contract is unambiguous, a court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993); see also Alexander & Alexander, 136 F.3d at 86; K. Bell & Assocs., 97 F.3d at 637. Contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties urge different

interpretations in the litigation." Metro. Life Ins. Co., 906
F.2d at 889; see also United States Tr. Co. of N.Y. v. Jenner,
168 F.3d 630, 632 (2d Cir. 1999); Wards Co. v. Stamford Ridgeway
Assocs., 761 F.2d 117, 120 (2d Cir. 1985). Where the contractual
language is subject to more than one reasonable meaning and
where extrinsic evidence of the parties' intent exists, the
question of the proper interpretation should be submitted to the
trier of fact. See Alexander & Alexander, 136 F.3d at 86;
Consarc Corp., 996 F.2d at 573; Compania Financiera de
Desarollo, S.A. v. Chase Manhattan Bank, No. 97-cv-5724 (JGK),
1998 WL 74299,*3 (S.D.N.Y. Feb. 19, 1998), aff'd, 165 F.3d 13
(2d Cir. 1998); see also Simpson v. Mut. of Omaha Ins. Co., No.
97-cv-1339 (JGK), 2000 WL 322780, at *3-4 (S.D.N.Y. Mar. 28,
2000).

Apple brought this lawsuit on December 31, 2013. On
February 4, 2014, Apple and Sterling signed a purchase
agreement. Defs.' 56.1 Stmt. ¶ 86; Pl.'s 56.1 Resp. ¶ 86. The
purchase agreement between Sterling and Apple is clear:
"[Sterling] will acquire all of the business, assets, and
rights" of Apple. Schoenstein Decl., Ex. 12, at 2. Sterling thus
acquired Apple's right to pursue the claims against the
defendants and thus, Apple lost its standing to bring its
claims. See Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 69
(2d Cir. 2001) ("[I]f the plaintiff loses standing at any time

during the pendency of the proceedings in the district court or in the appellate courts, the matter becomes moot, and the court loses jurisdiction.").

Apple does not argue that the contract is ambiguous. Apple instead argues that Sterling and Apple did not intend for Apple's claims to be included in the asset sale. See Appelbaum Aff. in Opp. to Defs.' Mot., Ex. A (letter from Sterling confirming that the present lawsuit was not included in the assets purchased by Sterling). To the extent that the purchase agreement appears to sell Apple's rights to Sterling, Apple argues that there was a mutual mistake by the parties. Under New York law, however, "a mutual mistake must be as to a fact, and not as to the legal consequences of the contract into which the parties are entering." Cobalt Multifamily Inv'rs I, LLC v. Bridge Capital (USVI), LLC, No. 06-cv-5738 (KMW)(MHD), 2007 WL 2584926, at *9 (S.D.N.Y. Sept. 7, 2007).

To the extent the agreement conveyed Apple's rights in this lawsuit to Sterling, Apple requests that this Court reform the contract to give effect to the parties' intent. But the Court cannot reform a contract between Apple and Sterling because Sterling is not a party to this action and the reformation would affect Sterling's rights under the purchase agreement. See Galbraith v. Guida, 554 N.Y.S.2d 592, 593 (App. Div. 1990) (a court cannot reform a contract when a necessary party has not

17

been joined in the action). In all the years this case has been pending, Apple has not sought to join Sterling in this action and has not submitted any evidence that Sterling conveyed its right back to Apple.

The plain language of the contract is clear. Apple does not have the right to pursue this action against the defendants because it sold that right to Sterling. There is no triable issue of material fact as to Apple's lack of standing. Thus, Apple's claims should be dismissed without prejudice for lack of jurisdiction.

**2.**

For purposes of completeness, the Court will also consider the other bases the defendants urge as arguments for summary judgment dismissing Apple's claims. The defendants argue that Apple's claims should be dismissed for lack of damages. Apple sought damages for the amount of commissions Apple would have received on loans that were originated by the defendants at GuardHill. Apple reasoned that since the defendants took customer lists, including the names and information of past Apple clients, Apple would have received a commission from those revenue streams if the defendants had not taken the clients' information. In its complaint Apple sought compensatory damages of $5 million and punitive damages of $10 million.  Apple most

recently drastically revised its damages statement downward to seek damages in the amount of $139,733.92,[5] the amount of commissions it would have received on 13 loans, plus the commissions the defendants received on another 6 loans which were originated after Apple ceased operations. Pl.'s 56.1 Resp. ¶ 106.

Summary judgment dismissing Apple's claims for lack of damages is not appropriate. There are genuine issues of material fact as to whether Apple would have originated various loans had it not been for the defendants' allegedly wrongful conduct. Therefore, the lack of damages is not an appropriate grounds on which to grant the defendants' motion for summary judgment.

### 3.

The defendants also move for summary judgment dismissing Apple's claims on the grounds that the claims fail as a matter of law. The defendants did not initially move to dismiss Apple's constructive trust claim and only mentioned the constructive trust claim in their reply brief. However, at the oral argument of the current motions, Apple agreed to the dismissal of the constructive trust claim. Therefore, Count 11 must be dismissed

---

[5] Apple originally alleged damages with respect to the defendants' signing bonuses, attorney and consultant fees, and other forms of economic loss. But Apple's papers in opposition only address damages from loans Apple could have allegedly originated, and the revised damages estimate does not include other types of damages. Pl.'s 56.1 Resp. ¶ 106.

on this additional ground. Apple also concedes that there is insufficient evidence to support its claim for tortious interference with existing and prospective contractual relations, Count 6, and does not oppose granting the defendants' motion for summary judgment dismissing Count 6. Thus, Count 6 must be dismissed on this additional ground.

With respect to the remaining claims on which the defendants argue that they are entitled to summary judgment based on the undisputed evidence, there are genuine issues of material fact that would preclude summary judgment on almost all of the claims on the grounds urged by the defendants.

**a.**

The defendants seek to dismiss Apple's causes of action alleging breach of the duty of loyalty and faithless servant claims, Counts 1 and 7, arguing that there is no evidence that the defendants were competing with Apple while still employed by Apple. However, there are genuine issues of material fact that preclude dismissal of these claims on that basis.

Under New York law, an employee owes the employer a duty of good faith and loyalty. While an employee may create a competing business before leaving the employer, an employee may breach the fiduciary duty to the employer if the employee makes "improper use of the employer's time, facilities, or proprietary secrets."

Island Sports Physical Therapy v. Burns, 923 N.Y.S.2d 156, 157-
58 (App. Div. 2011) (internal citations omitted). Solicitation
of customers is "not actionable unless the customer list could
be considered a trade secret, or there was wrongful conduct by
the employee . . . such as physically taking or copying files or
using confidential information." Id.; see also Fada Int'l. Corp.
v. Cheung, 870 N.Y.S.2d 23, 24 (App. Div. 2008).

Although the defendants argue that there is no evidence
they competed with Apple while still employed at Apple, they do
not dispute that they copied files and sent files and contact
information externally from their Apple computers to personal
email addresses and associated third parties, and that they did
so while still employed at Apple. Moreover, the defendants do
not dispute that there was at least some confidential
information in the materials they copied from Apple's Encompass
database. Defs.' 56.1 Stmt. ¶¶ 70-74. Breitstein, Furer, and
Ungar printed out summary sheets from the Encompass database
which contained information about mortgages for Apple customers.
Id. ¶ 74. And it is undisputed that the information from the
Encompass database contained private customer social security
numbers and dates of birth. Pl.'s 56.1 Resp. ¶ 76. The Court
therefore could not dismiss these claims on the basis that there
is no evidence to support them. The evidence is disputed and
raises genuine issues of material fact.

**b.**

The defendants move for summary judgment dismissing Count 2 for theft of business property, arguing that the defendants only made copies of documents, that Apple never lost access to these documents and files, and that Apple cannot identify any injury arising from the purported conversion because the defendants returned the documents in the course of discovery in this litigation.

Under New York law, a plaintiff must establish the following to succeed on a conversion claim: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." DeAngelis v. Corzine, 17 F. Supp. 3d 270, 282 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). New York recognizes a claim for conversion of electronic files. Thyroff v. Nationwide Mut. Ins. Co., 864 N.E.2d 1272, 1278 (N.Y. 2007).

The defendants do not argue that Apple failed to show that the claim of conversion relates to a specific identifiable thing or that Apple had ownership over the property before conversion. Rather, the defendants make two arguments that go to the third

element of conversion—the exercise of dominion to the exclusion of the plaintiff. The defendants point out that they returned the materials they saved on external memory devices, and that Apple's claim is now moot. However, "[a] party cannot avoid a conversion claim because it eventually returned the property in question. Returning property to the rightful owner . . . does not absolve defendants of all liability from the alleged conversion. A claim for conversion will exist even when the deprivation is partial or temporary." See Polanco v. NCO Portfolio Mgmt., Inc., 23 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

The defendants argue more persuasively that they only made copies of documents and files, and that Apple was not truly deprived of the documents in the first place. This argument calls into question whether the defendants exercised dominion over the documents to the exclusion of Apple's ability to use and access the documents. However, as Apple points out, its claims are premised on the fact that the defendants copied *and deleted* the documents on Apple's system and that the deletion altered the documents—an argument to which the defendants do not respond.

The issue of whether certain documents were ever truly lost and for how long is a question of fact that cannot be decided on a motion for summary judgment.

**c.**

The defendants move for summary judgment dismissing Count 3, Apple's unfair competition claim, on the basis that the client contact lists are not trade secrets and because Apple cannot show that it contributed to the creation of the contact lists. To sustain an unfair competition claim involving misappropriation, a plaintiff must establish that the defendant: (1) "misappropriated the plaintiff's labors, skills, expenditures, or good will"; and (2) "displayed some element of bad faith in doing so." Barbagallo v. Marcum LLP, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011).

Apple correctly points out that under New York law, an unfair competition claim may be based on the misappropriation of a client list where wrongful or fraudulent tactics are employed, even if the client list at issue is not a trade secret. Id. The Court could not resolve on this motion for summary judgment whether Apple's customer list was misappropriated by wrongful means such that its misappropriation could be the basis of an unfair competition claim.

**d.**

The defendants also move for summary judgment dismissing Apple's breach of contract claim. The gist of Apple's claim is that the defendants agreed not to post or send information

24

outside Apple regarding customer lists that constituted
confidential information, and that the defendants breached this
agreement. A provision in the Employee Handbook stated that
Apple prohibited "[s]ending or posting confidential material,
trade secrets, or proprietary information outside of the
organization." Rogin Decl., Ex. I, at 34 (§ 517). The defendants
contend that the Employee Handbook is not a contract. The
Employee Handbook states that it is "not a contract of
employment or a legal document" Rogin Decl., Ex. I, at 7.

Under New York law, "[r]outinely issued employee manuals,
handbooks and policy statements should not lightly be converted
into binding employment agreements." Lobosco V. New York Tel.
Co./NYNEX, 751 N.E.2d 462, 465 (N.Y. 2001). Here, the language
of the Employee Handbook disclaims that it is a contract or a
legal document. But the defendants testified that they agreed
that the customer's lists were confidential and could not be
posted or sent outside of Apple. The defendants so testified in
the context of being asked about the Employee Handbook. See
Rogin Decl., Ex. D, 33-34, 37-38; Rogin Decl., Ex. E, at 30-32;
Rogin Decl., Ex. F, at 45-46; Rogin Decl., Ex. G, at 28-29. The
defendants' deposition testimony at least raises a question of
fact as to whether the defendants agreed not to copy or send the
information outside Apple, and the defendants do not deny they
testified that they so agreed. See Defs.' Reply at 9.

Therefore, the Court could not grant summary judgment dismissing Count 4 on this basis.

**e.**

The defendants also move for summary judgment dismissing Count 5, Apple's conspiracy claim. Under New York law, to sustain a civil conspiracy claim, a plaintiff must prove the existence of an agreement to commit an otherwise actionable tort. See Alexander & Alexander, Inc. v. Fritzen, 503 N.E.2d 102, 103 (N.Y. 1986). A claim for conspiracy requires "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." Fisk v. Letterman, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006) (internal citation and quotation marks omitted).

The defendants argue that there is no evidence of an agreement to commit an actionable tort. They argue that the mere act of co-workers deciding to resign at the same time is insufficient to constitute a conspiracy. Apple argues that Breitstein, Ungar, and Furer conspired to take information from Apple's mortgage loan documents, Forms 1003 and 1008. The defendants do not dispute that they took this information. The defendants testified that they discussed going to work for

GuardHill together and that they knew that the contract with
GuardHill required that they get the full database of clients
and referral sources before starting work at GuardHill. Rogin
Decl., Ex. E, at 38; Rogin Decl., Ex. E, at 71; Rogin Decl., Ex.
F, at 77; Rogin Decl., Ex. G, at 79-80. Moreover, Furer and
Ungar also testified that Breitstein suggested that the
defendants copy the first page of Form 1003, which contained the
clients' birthdays. Rogin Decl., Ex. E, at 83-84; Rogin Decl.,
Ex. G, at 85-87, 137-38. And there was also evidence of an email
exchange between Breitstein and Furer discussing how Furer could
delete all his contacts and files remotely from Apple's system.
Rogin Decl., Ex. E, at 93. This evidence raises a triable issue
of fact at least as to whether defendants Breitstein, Furer, and
Ungar agreed to delete information from Apple's system and/or
whether they agreed to take information from the Encompass
database that included clients' confidential information.

    Apple does not point to any specific evidence of
Barenblatt's involvement in deleting files or in accessing non-
public client information on the Encompass database. Thus, there
is an independent basis to grant the motion for summary judgment
dismissing Count 5 only against defendant Barenblatt.

**f.**

The defendants move for summary judgment dismissing Counts 8 to 10, Apple's claims under the CFAA, 18 U.S.C. §§ 1030(a)(2), 1030(a)(4), and 1030(a)(5). The CFAA is a criminal statute that also provides a private right of action. See 18 U.S.C. § 1030(g). Under § 1030(a)(2)(C) "[w]hoever ... intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer" is liable under the statute. Section 1030(a)(4) prohibits accessing a protected computer without authorization "knowingly and with intent to defraud" and thereby "obtain[ing] anything of value." Section 1030(a)(5)(A) prohibits knowingly transmitting "a program, information, code, or command" and intentionally causing unauthorized damage, to a protected computer.

The gist of the CFAA claims is that the defendants printed documents, emailed themselves contact lists, deleted files, and stored files onto external memory devices. The defendants argue that they had authorization to access the computers prior to their resignations on September 3, 2013, and thus, the defendants contend that their conduct does not constitute unauthorized access under the CFAA. Moreover, the defendants argue that they did not access the Apple computer system after their departures from the company. Defs.' 56.1 Stmt. ¶¶ 79-80.

Apple concedes that the defendants' actions in accessing and compiling files prior to their resignations do not constitute unauthorized access under the CFAA. Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. at 24. If an employer has given an employee access to the computer and to the relevant files, the employee's subsequent misuse of the information or misappropriation with the intent to compete with his employer is not sufficient to violate the CFAA.[6] See Orbit One Commc'ns, Inc. v. Numerex Corp., 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010) ("[R]eading the phrases 'access without authorization' and 'exceeds authorized access' to encompass an employee's misuse or misappropriation of information to which the employee freely was given access and which the employee lawfully obtained would depart from the plain meaning of the statute.").

Apple, however, contends that there is evidence that the defendants "wrongfully accessed and deleted files *after* they resigned." Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J.

---

[6] The courts in this district have split on the interpretation of "exceeds authorized access" with several courts adopting the above-mentioned narrow approach to the interpretation of the CFAA over a broad construction that interprets the CFAA to cover situations where the employee misuses information the employee is otherwise permitted to access. See JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 521–22 (S.D.N.Y. 2013)(discussing the split among the Courts of Appeals and collecting cases from this district). Most recently the Second Circuit Court of Appeals adopted a narrow interpretation of the CFAA in a criminal case, and reversed a conviction under the CFAA where the defendant "violated the terms of his employment by putting his authorized computer access to personal use." United States v. Valle, 807 F.3d 508, 523 (2d Cir. 2015).

at 24-25 (emphasis in the original). Apple argues that the
defendants accessed emails on their cell phones after resigning,
and that their access was unauthorized and constitutes a
violation of the CFAA.[7] It is undisputed that the defendants
continued to receive emails because Apple had not changed the
codes on its computer system in the days following the
defendants' resignation. Defs.' 56.1 Stmt. ¶¶ 79-80; Pl.'s 56.1
Resp. ¶¶ 79-80.

The defendants' motion for summary judgment dismissing the
CFAA claim must be denied because there is evidence that after
the employees resigned they accessed emails from the Apple
system on their phones and read, forwarded, or deleted emails.
Mamakas Rep. ¶¶ 13-16, 24, 30-31, 33-34. There is a triable
issue of fact as to whether they acted "without authorization"
when they accessed, deleted, or forwarded these emails. See
Poller v. Bioscrip, Inc., 974 F. Supp. 2d 204, 233 (S.D.N.Y.
2013) ("[W]here an employee has certain access to a computer or
system associated with her job, that access will be construed as
unauthorized within the meaning of the CFAA only where it occurs

---

[7] Apple points to the affidavit and report of Emanuel Mamakas as evidence that
the defendants accessed emails on their phones after they resigned. The
defendants urge the Court to preclude the Mamakas Report because Apple
allegedly did not timely disclose Mamakas as an expert witness. That argument
has no merit. Apple did make its computer servers available for inspection
and disclosed Mamakas as a witness. Apple made Mamakas available to be
deposed but the defendants chose not to depose him. Any defects in timing
were harmless.

after the employee is terminated or resigns."). Therefore, the motion for summary judgment dismissing the CFAA claims could not be granted to the extent Apple complains and can show injury related to the emails the defendants read, deleted, or forwarded after they resigned.

**B.**

As part of the defendants' motion for summary judgment, the defendants moved for summary judgment as to liability on their counterclaims against Apple. All the counterclaims are claims for violations of New York law. Apple in turn has moved for summary judgment dismissing the defendants' counterclaims. "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal citation omitted). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Id. (internal citation omitted). The motions for summary judgment by the defendants and by Apple are dueling motions and will be treated together because most, if not all, of the arguments overlap.

The defendants originally asserted seven counterclaims for: (1) breach of contract, (2) promissory estoppel, (3) quantum

meruit, (4) unjust enrichment, (5) violation of § 191(c) of the
New York Labor Law for unpaid commissions,[8] (6) violation § 193
of the New York Labor Law for improper deductions, and (7) an
accounting of all mortgage transaction fees paid to Apple and
all commissions paid to the defendants during the defendants'
employment. See Rogin Decl., Ex. B, ¶¶ 122-63. In the course of
briefing the current motions, the defendants withdrew their
claims for promissory estoppel, quantum meruit, unjust
enrichment, and an accounting, leaving only the breach of
contract and the New York Labor Law claims. Defs.' Mem. of Law
in Opp. to Pl.'s Mot. at 2.

The gist of the remaining counterclaims is that Apple paid
the defendants commissions that were inconsistent with the
formulas in the Compensation Agreements between Apple and the
defendants. The defendants also claimed that following their
resignations, Apple refused to pay commissions owed to the
defendants, and that Apple violated the New York Labor Law by
imposing improper deductions for the entire length of the
defendants' employment at Apple.

Under Section 191 of the New York Labor Law, any
"commission salesperson shall be paid the wages . . .
commissions and all other monies earned or payable in accordance

---

[8] The counterclaims duplicatively labeled both the unjust enrichment claim and
the violation of § 191 of the New York Labor Law for unpaid commissions claim
as "Fourth" Causes of Action.

with the agreed terms of employment[.]" N.Y. Lab. Law § 191 (1)(c). "Wages" means "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." Id. § 190. A threshold issue in this case is whether the commissions and the bonuses the defendants claim are in fact "wages" subject to the requirements of the New York Labor law of prompt payment upon an employee's termination. Id. § 191-c.

## 1.

The defendants' breach of contract claim seeks damages for two sets of payments: (1) unpaid commissions on loans that the defendants allegedly originated at Apple, and (2) bonuses that were typically paid at the end of each quarter.

Apple moved for summary judgment dismissing the breach of contract claim, arguing that the defendants breached the Compensation Agreements first and that Apple should be relieved of further performance under the contracts. Apple opposed the defendants' motion for summary judgment on the same grounds. Apple also argues that the breach of contract claim for failure to pay bonuses should be dismissed because the payment of bonuses under the Compensation Agreements was discretionary and the defendants do not have a contractual right to bonus payments.

To the extent Apple seeks to dismiss the breach of contract claim because it claims that the defendants breached the contracts first, this argument could not justify summary judgment because there are genuine disputes as to material facts. Apple points out that the Compensation Agreements required the defendants to comply with all federal and state laws. See Rogin Decl., Exs. N-Q, § 1.3. Apple contends that the defendants breached the contract by violating New York's Banking Department Regulations § 420.20(a)(7) which prohibits mortgage loan originators from downloading or removing borrowers' or loan applicants' files or other information without the permission of the originating entity. 3 N.Y.C.R.R. § 420.20(a)(7). Apple contends that Breitstein, Furer, and Unger- but not Barenblatt-breached this regulation by downloading and/or printing customers' Forms 1003 and 1008.

"Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract[.]" NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003). The defendants do not dispute that they downloaded confidential information. They do, however, contend that they did not use this information. Several issues of fact remain to be resolved: (1) whether the defendants' actions in taking but not using the confidential

34

information violated New York law, and (2) whether the
defendants' actions constitute a material breach of the
Compensation Agreements. Thus, these issues preclude a finding
that the defendants materially breached their contracts and that
Apple is entitled to summary judgment dismissing the defendants'
breach of contract claim. Because Apple's defense to the breach
of contract claim cannot be decided on a motion for summary
judgment, the defendants' cross-motion for summary judgment as
to Apple's liability for breach of contract similarly fails.

The defendants' moving papers with respect to their claims
for commissions focus on whether commissions were earned under
the New York Labor Law. The defendants contend that the
commissions were earned "upon procurement of ready, willing and
able borrowers and lenders." Defs.' Mem. of Law in Supp. of Mot.
at 14. Under § 191-c of the New York Labor Law "when a contract
between a principal and a sales representative is terminated,
all earned commissions shall be paid within five business days
after termination or within five business days after they become
due in the case of earned commissions not due when the contract
is terminated." N.Y. Lab. Law § 191-c(1). The defendants claim
that Apple violated this provision by refusing to pay them
commissions on loans that they originated but for which they had
not been paid when they left Apple. Apple argues that the
Compensation Agreements do not provide for commission payments

after termination, and thus, without a contractual right, the defendants also lack a claim under the New York Labor Law.

A claim under Article 6 of the New York Labor Law for the payment of wages "rises and falls with a plaintiff's claim for breach of contract. Failure to establish a contractual right to wages necessarily precludes a statutory claim under New York's labor law." Simas v. Merrill Corp., No. 02-cv-4400 (RCC), 2004 WL 213013, at *2 (S.D.N.Y. Feb. 4, 2004) (internal citation omitted). "[I]t is a well-settled principle of New York law that an at-will employee will be entitled to post-discharge commissions only if the employment agreement expressly provides for such compensation." Bravia Capital Partners, Inc. v. Fike, No. 09-cv-6375 (JFK), 2011 WL 6081345, at *3 (S.D.N.Y. Dec. 6, 2011). In Bravia, the plaintiff argued that she was entitled to commissions on transactions that closed after her termination because the contract did not make continued employment a condition precedent to receiving commissions. Id. The court rejected the plaintiff's argument because the contract did not contain a provision expressly providing for post-termination commissions. In this case, the Compensation Agreements state that compensation "will be based on [x%] of the loan amount." E.g., Rogin Decl., Ex. N. The Compensation Agreements do not specify whether employees will receive commissions if they are no longer working for Apple.

36

The defendants contend that the Compensation Agreements
support payment of post-employment commissions and liken the
language of the Compensation Agreements to contracts in two
other New York cases. But the cases the defendants rely upon are
distinguishable. In Arbeeny v. Kennedy Executive Search, Inc.,
893 N.Y.S.2d 39, 42 (App. Div. 2010), the court held that the
plaintiff had "sufficiently stated a breach of contract claim
for unpaid earned commissions that he 'arranged' prior to his
termination." The contract specifically stated that he would
receive commissions for transactions he "arranged." Id. at 40.
And in Yudell v. Ann Israel & Assocs., Inc., the "plaintiff
would earn commissions based on a percentage 'of all fees
actually received by us in cash from placements which are
clearly identified as originated by you.'" 669 N.Y.S.2d 580, 580
(App. Div. 1998). In this case, the Compensation Agreements do
not specify when the commission is earned, indicating only that
it "will be based on 50% of the loan amount." Unlike Arbeeny and
Yudell, there is no language in the Compensation Agreements that
entitles the defendants to commissions on loans that they
"arranged" or "originated." Thus, there is no language to
support the defendants' argument that they are entitled to
commissions on loans that close after the termination of the
defendants' employment. See Arbeeny, 893 N.Y.S.2d at 40-41;

Yudell, 669 N.Y.S.2d at 580; see also Linder v. Innovative Commercial Sys. LLC, 8 N.Y.S.3d 191, 192 (App. Div. 2015).

The defendants argue that they do not seek open-ended commissions or compensation for additional transactions, only commissions for deals they actually procured before leaving Apple. The defendants would not be entitled to summary judgment based on this rationale because it is unclear how far along in the process of completion a loan would have to be before requiring a commission payment.

Apple also moves for summary judgment dismissing the defendants' counterclaims under the New York Labor Law for unpaid commissions for any loans for which the defendants had not been paid at the time they left Apple. Apple contends that an employee was "not entitled to receive a commission until loans closed and funded." Pl.'s 56.1 Stmt. ¶ 65. Apple refuses to pay commissions on any loans, even on the loans that closed while the defendants were still employed at Apple but for which the defendants had not yet been paid when they left Apple. It appears that Furer, Barenblatt, and Ungar were the loan originators on some loans that closed before they resigned from Apple, and that were funded either shortly before or shortly after they resigned from Apple. Defs.' 56.1 Resp. ¶ 67. Apple's position is that Apple does not owe Furer, Barenblatt, and Ungar commissions even on these loans because the defendants did not

submit a commission calculation statement and because they would
not have received payment until the next payroll payment which
was on September 13, 2013, ten days after the defendants
resigned. Appelbaum Aff. ¶¶ 4-7. Apple does not point to any
case law to support this proposition.

While the Compensation Agreements do not provide for
commissions on loans as soon as they are "arranged" or
"originated" as in Arbeeny and Yudell, the Compensation
Agreements do not make employment during the payroll payment
period a condition of payment. Apple's motion for summary
judgment dismissing the counterclaims must be denied with
respect to the counterclaims for commissions on loans that
closed before the defendants left Apple. See Appelbaum Aff. ¶ 4.
There is at least a question of fact as to whether these
commissions should be classified as "post-termination" or pre-
termination. It is unclear whether the Compensation Agreements
contemplated that the employees should receive their commissions
in the event that they left Apple before submitting their final
commission sheets and whether the Compensation Agreements
preclude paying the employees commissions because the employees
were no longer employed at the time the final paychecks were
issued. See McGimpsey v. J. Robert Folchetti & Associates, LLC,
798 N.Y.S.2d 498, 500 (App. Div. 2005) (granting summary
judgment dismissing a claim for post-termination commissions but

denying summary judgment to dismiss a claim for pre-termination commissions).

Therefore, the defendants' motion for summary judgment on Count 4 for violations of New York Labor Law § 191 and Count 1 for breach of contract based on unpaid commissions and Apple's motion for summary judgment on the same claims are denied.

**2.**

Apple argues that the defendants' claim for unpaid bonuses fails as a matter of law because the parties did not agree to a contract that required Apple to pay bonuses. "[W]here an employee's contract either leaves the bonus in the employer's discretion or conditions it on an event that has not occurred, such as employment through a specific date, courts have decided such questions as a matter of law." Vetromile v. JPI Partners, LLC, 706 F. Supp. 2d 442, 449 (S.D.N.Y. 2010). "Under New York law, an employee cannot recover a bonus under an employment agreement that provides the employer with absolute discretion in deciding whether to pay the bonus." Bravia, 2011 WL 6081345, at *4. The discretion to withhold a bonus must be set forth in the agreement. Id. Provisions stating that an employee "will be entitled to a bonus" do not vest discretion in the employer while provisions stating that the employer reserves the right to "reduce, modify, or withhold compensation" or that "distribution of bonuses will be determined by [the employer]" do vest

40

sufficient discretion. Id. (collecting cases) (internal
citations and quotation marks omitted).

In this case, the Compensation Agreements set out several
instances where an employee was "eligible for an additional 3%
of the loan amount to be paid quarterly" if for example, the
employee originated the same or more loans in the preceding
quarter than in the same quarter of the previous year, if the
loan applications passed a quality check, if the loan applicant
gives positive feedback about the employee, if the employee
originates a loan through a new referral source, and if the
employee closed a new transaction for a past customer. E.g.,
Rogin Decl., Ex. N.

The defendants testified that they understood the
difference between being "eligible" for a bonus and being
"entitled" to a bonus. See Rogin Decl., Ex. D, at 42-43
(Breitstein); Rogin Decl., Ex. E, at 37 (Furer); Rogin Decl.,
Ex. G, at 244-45 (Ungar). Barenblatt acknowledged that the term
"eligible" was used with respect to bonuses, but testified that
"in practice it was business as usual that on each end of each
quarter we were expected to be paid the overage." Rogin Decl.,
Ex. F, at 50-51. Ungar similarly stated that the right to the
bonus was not in the contract but that it was "clear, over the
course of time, how [the employees] were paid [their] bonus, and
an expectation of a bonus. So [he] expected to get that the same

way [he] got all the other ones at the same time every quarter on the dot." Rogin Decl., Ex. G, at 251. The parties dispute whether Apple agreed orally to pay bonuses in regular quarterly intervals, but the only evidence that Apple may have agreed is the defendants' affidavits submitted in connection with the current motion. Defs.' 56.1 Stmt. ¶ 12; Pl.'s 56.1 Resp. ¶ 12.

The defendants submitted affidavits stating that "In practice, although the [bonus] amounts were discretionary under the Compensation Agreement, Apple agreed orally to pay such amounts in regular quarterly intervals and did so at all times prior to my departure." E.g., Barenblatt Aff. in Supp. of Defs.' Mot. ¶ 10. The defendants cannot rely on these affidavits to contradict their deposition testimony that their belief as to an agreement was based on the constant fulfillment of their expectations. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). The deposition testimony only indicated that the defendants may have expected a bonus; the defendants did not testify that there was an oral agreement with Apple. The defendants' subjective beliefs about past practice are insufficient to show that Apple had a contractual duty to pay bonuses. See Doolittle v. Nixon Peabody

LLP, 6 N.Y.S.3d 864, 867 (App. Div. 2015) ("[D]efendant's past practice with respect to collections bonuses is not dispositive of plaintiff's breach of contract cause of action. It is well established that the existence of a binding contract is not dependent on the subjective intent" of the parties." (internal quotation marks and citation omitted)).

Because the bonuses were discretionary, the bonuses do not fall within the meaning of wages under New York Labor Law § 190(1). See Ryan v. Kellogg Partners Institutional Servs., 968 N.E.2d 947, 956 (N.Y. 2012).

Thus, the defendants' motion for summary judgment on their bonus claims should be denied and Apple's motion for summary judgment dismissing the defendants' claims for unpaid bonuses should be granted.[9] Count 4 of the counterclaims for violation of New York Labor Law § 191 based on unpaid bonuses and Count 1 for breach of contract for Apple's refusal to pay bonuses should therefore be dismissed.[10]

---

[9] One exception is Furer's claim for a bonus of $5,967.50 for allegedly mentoring Mamakas. Defs.' 56.1 Resp. ¶ 68. While there was no written agreement, Furer claimed that Appelbaum orally promised him an override commission on the loans Mamakas closed. There is at least an issue of fact whether such an agreement existed and what the amount of such bonus was. The existence of that alleged agreement does not appear to be foreclosed by Furer's deposition testimony.

[10] The defendants' Fourth Cause of Action for violation of New York Labor Law § 191 is in fact the second counterclaim labeled "Fourth Cause of Action."

3.

Apple also moves for summary judgment dismissing Count 5 of the defendants' counterclaims which alleges improper deductions under the New York Labor Law. The defendants oppose Apple's motion for summary judgment dismissing this claim and also cross move for summary judgment with respect to Apple's liability. The defendants argue that Apple imposed improper deductions on them for leads, advertising, wages to other employees, and another deduction labeled "FICA". Defs.' 56.1 Resp. ¶ 75.

The defendants' fifth counterclaim for violation of New York Labor Law § 193 for improper deductions did not mention the deductions for advertising expenses and other fees. These additional deductions were not pleaded as part of that counterclaim and were not included in their statement of damages. There is no basis to expand the improper deduction claim to include any deductions beyond the "FICA" deduction. Therefore, the defendants' only improper deduction claim is with respect to the "FICA" deduction of $276.

The defendants allege that the $276 "FICA" deduction was improperly taken from their paychecks during the time period they were employed at Apple. Pl.'s 56.1 Stmt. ¶ 72; Defs.' 56.1 Stmt. ¶ 72. Apple acknowledges that the $276 deduction was not part of a FICA payment. Defs.' 56.1 ¶ 21; Pl.'s 56.1 Resp. ¶ 21. However, although the defendants contend that they were told

that the charge was intended to cover FICA, Apple states that it
never justified the deduction as a FICA contribution. Pl.'s 56.1
Resp. ¶ 22.

As part of their cross-motion for summary judgment, the
defendants argue that there was a clear written agreement on the
topic of compensation, the Compensation Agreement, and that the
agreement did not provide for the "FICA" deductions. The
defendants contend that the deductions were therefore invalid
under the New York Labor Law. On the other hand, Apple argues
that the commissions were not deemed earned under New York law
until the deductions were taken and thus there was no violation
of the New York Labor Law.

Under the New York Labor Law, deductions from the wages of
an employee are prohibited except for deductions that meet
certain criteria, including those that are "expressly authorized
in writing by the employee and are for the benefit of the
employee, provided that such authorization is voluntary and only
given following receipt by the employee of written notice of all
terms and conditions of the payment and/or its benefits and the
details of the manner in which deductions will be made."  N.Y.
Lab. Law § 193. However, Apple points to an opinion by the New
York Court of Appeals, Pachter v. Bernard Hodes Group, Inc., 891
N.E.2d 279 (N.Y. 2008), in which the New York Court of Appeals
answered a question certified by the Second Circuit Court of

Appeals concerning when a commission is "earned" and becomes a "wage" under New York Labor Law § 193. See Pachter v. Bernard Hodes Grp., Inc., 505 F.3d 129, 134-35 (2d Cir. 2007). The New York Court of Appeals held that the "determination of when a commission is earned is governed by the parties express or implied agreement." Pachter, 891 N.E.2d at 281. If adjustments are made to a commission before it is "earned" then the adjustments do not violate § 193. Id. at 284. The New York Court of Appeals concluded that when a commission is "earned" and becomes a "wage" under New York Labor Law Article 6 "is regulated by the parties' express or implied agreement; or, if no agreement exists, by the default common-law rule that ties the earning of a commission to the employee's production of a ready, willing and able purchaser of the services." Id. at 285.

The Second Circuit Court of Appeals concluded that the employee in Pachter had knowingly acquiesced over several years to the method in which her employer calculated her commissions, including the deductions, and that the conduct constituted an implied agreement between the parties that the commission was not earned until the deductions were made. Pachter v. Bernard Hodes Grp., Inc., 541 F.3d 461, 464 (2d Cir. 2008).

In this case, the course of conduct of how commissions were calculated and paid makes clear that the commissions were not earned until after Apple took the deductions. See Rogin Decl.,

Ex. F, at 225 (Barenblatt testified that he did not receive the commission until the FICA deduction was deducted). The defendants actually prepared commission worksheets which they submitted to Apple, and these worksheets included the $276 deduction. E.g., Rogin Decl., Ex. D, at 296. The case for concluding that the defendants acquiesced to the deductions is even stronger than in Pachter. In Pachter, the plaintiff was aware that her employer calculated and applied certain deductions before she received her commission. Pachter, 891 N.E.2d at 281. In this case, the defendants actually compiled the commission sheets and input the "FICA" deduction. Breitstein testified that he objected to the FICA deduction, but he nevertheless continued to input the deduction in his commission sheets. Rogin Decl., Ex. D, at 292-93. During the oral argument of the present motion, the defendants argued that they never truly acquiesced because Appelbaum misled them about the nature of the FICA deduction. Apple denied the allegation and the defendants never pleaded a cause of action for fraud in their counterclaims.

As the defendants point out, the Compensation Agreements became operative in July 2012. Therefore, the Compensation Agreements as the parties' express agreement, not the parties' course of conduct, would control whether the FICA deduction was properly taken between July 2012 and September 2013. See

47

_Pachter_, 891 N.E.2d at 285; _Karic v. Major Automotive Cos._, 992 F. Supp. 2d 196, 202 (E.D.N.Y. 2014) (concluding that the plain language of the plaintiffs' employment agreements should control). There is at least a question of fact under the Compensation Agreements whether the deductions were improperly taken after July 2012. The Compensation Agreements provide that the compensation "will be based on" a percentage of the loan amount without any provision for deductions. However, only one of the defendants continued to be subject to the deduction in the relevant time period. Barenblatt's deductions ceased in July 2012. Barenblatt Aff. ¶ 20. Ungar's deductions also ceased in July 2012. Ungar Aff. ¶ 21. Furer was only charged the FICA deduction until 2004. Furer Aff. ¶ 18. Only Breitstein continued to be charged the deduction until his resignation in September of 2013. Breitstein Aff. ¶ 18. Thus, an issue of fact as to whether the Compensation Agreement allowed the "FICA" deductions only exists with respect to Breitstein's paychecks between July 2012 and September 2013.

Apple also argued that any deductions prior to January 16, 2008, are barred by the six year statute of limitations in New York Labor Law § 663(3) because the counterclaims were only filed on January 16, 2014. At the oral argument on the current motions, the defendants withdrew their claims for improper deductions for deductions prior to 2008. The only remaining

claim with respect to the allegedly improper $276 deduction that can rely on the Compensation Agreement is the claim by Breitstein for the period from July 2012 to September 2013.

Thus, Apple's motion for summary judgment dismissing Count 5 for improper deductions under the New York Labor Law is granted in part with respect to the claims by Furer, Ungar, and Barenblatt and denied in part with respect to the claim by Breitstein.

### CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment dismissing Apple's claims is granted, and the defendants' cross-motion for summary judgment as to Apple's liability on the counterclaims is denied. Apple's motion for summary judgment dismissing the defendants' counterclaims is granted in part and denied in part. To the extent not specifically addressed above, the parties' arguments are either moot or without merit. The Clerk of Court is directed to close all pending motions.

**SO ORDERED.**

**Dated:    New York, New York**
**         February 15, 2016**

_____/s/_____

**John G. Koeltl**
**United States District Judge**